ANDREW HUNT *v.* THE STATE.

1. MURDER IN THE FIRST DEGREE. — The Constitution of 1869 provided, in effect, that the punishment for murder in the first degree, which by statute was previously death alone, should be death or imprisonment at hard labor for life.   The Constitution of 1876, which superseded that of 1869, retained in force "all laws and parts of laws" not repugnant, but contains no other provision affecting the punishment for murder in the first degree; and until the adoption of the Revised Penal Code, which took effect July 24, 1879, there was no statutory legislation on the subject subsequent to the abrogation of the Constitution of 1869 by that of 1876.   *Held: First,* that

the Constitution of 1876, in superseding that of 1869, abrogated the said provision of the latter, but retained in force the antecedent statutory punishment for murder in the first degree, viz., death alone. *Second,* in a trial for murder in the first degree, committed while the Constitution of 1869 was in force, it is still necessary, as heretofore held, that the aforesaid provision of that Constitution be given in charge to the jury, inasmuch as it is part of the "law applicable to the case;" but in a trial for murder in the first degree, committed since the Constitution of 1876 became operative, and before the Revised Penal Code took effect, it was not error to instruct the jury that the penalty was death.

2. CONSTITUTIONAL CONSTRUCTION. — Technical rules are not to control the interpretation of a written constitution. It is to be so expounded as to give effect to its principles and accomplish the ends of government, and not so as to defeat them. See the opinion *in extenso* on this subject.

3. CHARGE OF THE COURT. — In trials for murder, wherein the inculpatory evidence is purely circumstantial, it is necessary that the court give in charge to the jury, as "law applicable to the case," the legal principle that the facts proved must be inexplicable except by the hypothesis of guilt, must be consistent with each other and with the main fact in issue, and must each be established by evidence as cogent as if it were the main fact. An instruction to this effect is not a charge on the "weight of evidence;" and though it is but a development of the doctrine of reasonable doubt, yet when the inculpatory evidence is entirely circumstantial its omission is not supplied by the ordinary charge of that doctrine requisite in every trial for a felony.

4. SAME. — In giving instructions to a jury, it is never safe to depart from established authorities; and in trials for murder, the courts of this State cannot err if, without attempting novel expositions of the law, they adhere to the language of standard cases.

APPEAL from the District Court of Williamson. Tried below before the Hon. E. B. TURNER.

At the March term, 1878, of the court below, the appellant was indicted for the murder of Harvey Carter, on September 28, 1877. One count of the indictment alleged a knife to have been the means used, and a second count alleged a pistol. A mistrial of the case was had at the same term of the court. At the September term, 1878, the appellant was again put on trial, and was found guilty of murder in the first degree, and adjudged to die. The grounds upon which he appeals to this court are disclosed in its opinion.

The homicide was an assassination, and the evidence quite singular in its disclosures. Of many witnesses examined, there was none who saw the deed committed, and the voluminous evidence is entirely circumstantial in so far as it tends to inculpate the appellant. There is no occasion to give it in detail, and only an outline of the material disclosures will be attempted.

The appellant, it appears, was a man of family, and lived on his farm, which was about twenty miles from the town of Round Rock, in Williamson County. Carter, the deceased, was a single man, and farmed with the appellant on the latter's place during the cropping season of 1877. In the forenoon of the day on which Carter was murdered (September 28, 1877), he and the defendant took their wagon and two-horse team to the gin of Hayden Hunt, in their neighborhood, and there took on two bales of cotton, one of which belonged to them and the other to Hayden Hunt, who sent his bale by them to market at Round Rock. The road from the gin towards Round Rock was sparsely settled, and no witness saw them on their route on the day of the murder, until after they had gone into camp at Pucket's Spring, a camping-place about three miles from Round Rock.

About sunset on the same day, J. W. Perry, Ben. Perry, and W. R. Copeland camped at Pucket's Spring, on their homeward way from Round Rock, where they had just sold six bales of cotton. Soon after they stopped to camp, Andrew Hunt (the defendant, commonly called Drew Hunt) and Harvey Carter, the deceased, came on foot from the spring to the camp of the Perrys and Copeland, and inquired of these latter if they had been to Round Rock, and what was the price of cotton. In a few minutes they left, saying they were going to their camp, which was in a south-westerly direction, and considerably over a hundred yards distant. Soon after nightfall, and while the Perrys and Copeland were cooking their supper, the appellant and

deceased again came to their camp. They seemed on friendly and good terms with each other, though one of the witnesses said that the defendant was stepping about the camp, and seemed restless and uneasy. Before their second appearance, three other men had come into the Perrys' camp. They were named Collier, Goats, and Jennings, were riding, and two of them had Winchester rifles. They seemed somewhat intoxicated, and asked for water to mix with some alcohol, and at their invitation all present except the deceased took a drink of the alcohol and water. Soon afterwards these three men left, riding rapidly along the road, which led in a westerly direction. Their horses' feet were heard for a considerable but indefinite distance. Whether they or the defendant and the deceased first left the camp of the Perrys seems somewhat uncertain from the testimony. However that may be, but a short space of time elapsed after the departure of their visitors before the Perrys and Copeland heard three shots in the direction of the camp of the defendant and the deceased, and immediately the voice of the deceased was heard by the Perrys, exclaiming, " O Drew! O Drew! O Drew!" followed by a strangling or gurgling noise. According to Copeland, the words were, " O Drew! O Drew!" followed without interval by the word " shoot." Though listening for more, these parties heard nothing further, —neither walking, talking, running, horses' steps, or other noise, —until in a very brief space of time, perhaps as much as two minutes after the gurgling noise, the defendant suddenly appeared in their camp, panting and apparently scared, in his shirt-sleeves and pants, but without coat, hat, or shoes, and exclaimed, " Good God! what shall I do? Harvey is dead (or killed) and I am cut all to pieces. Robbers or murderers have run in on us and killed Carter, and cut me all to pieces." Instantly the Perrys, apprehensive for themselves, extinguished their camp-fire. Defendant asked them to go back with him to Carter. They refused to do so, and he then said he wanted to

go to the spring for water, and J. W. Perry advised him not to do so, but to go to town and get an officer; and in a few minutes the defendant and Ben. Perry started to Round Rock for an officer, riding horses belonging to the Perrys. Copeland and J. W. Perry took refuge in Pucket's sugar-cane patch until Ben. Perry and the defendant returned with an officer and a number of men; and while in the patch they heard, in the direction of the camping-ground, a noise like a low voice uttering "ugh," as described by Copeland.

Ben. Perry, who accompanied the defendant to Round Rock, stated that when they reached Brushy Creek the defendant washed his face and hands, and when they arrived at Hall's, who was a deputy-sheriff, defendant was taken in where there was a light, and found bloody on the hands and arms; but he showed no cuts. The deputy-sheriff and his posse, accompanied by Ben. Perry and the defendant, proceeded promptly to the camp of the defendant and the deceased. When they reached the ground the defendant went into the brush and said, "Here, boys, is Carter; he is dead." The deceased had on no shoes or pants; he was found in his shirt, drawers, and socks, dead, at a distance of forty yards from his and the defendant's wagon, and eighty yards from and in the direction of the camp of the Perrys and Copeland. According to Ben. Perry's testimony, the defendant, when he came panting to their camp, immediately after the shooting, made not only the statement already related, but added that two men came up right behind the pallet of himself and Carter, and fired in on them, killed Carter and cut him; that, "just as he was lying down, Carter being already down, he heard a brush or stick crack; he raised up, and about that time they fired in on them; saw two men; one had a pistol, the other a short gun; they were about five steps distant when they fired on them; they were coming up half-bent. He said one of them (Carter or Hunt) ran under the wagon, and

the other around the wagon. I think he said that he, defendant, ran under the wagon, and Carter around the wagon; said Carter called to him and said, ' O Drew! O Drew! don't leave me,' and he ran back to him and caught hold of him sort of under his arms, to help him off, and ran with him about ten steps, and they crowded him so close he left him." Defendant also stated that he had no arms, but that Carter had a pistol with three loads in it; but that he (defendant) did not know whether it was in the feed-box, or where it was, — that Carter had been shooting at squirrels with it that evening. No arms were seen on the defendant; and he went willingly with Ben. Perry after the officer, and returned willingly to the scene of the murder. Carter's body was taken to Round Rock that night, and Dr. Cochran, by request of the acting coroner, examined it the next day, and found that one gunshot entered at the navel and passed round until it lodged just under the skin, near the right hip-joint. Another entered near the backbone, opposite the left shoulder, passed along the shoulder-blade, and lodged at the left shoulder-joint, which it shattered. A third passed through the leg. There were two knife-wounds in the throat, — one a cut across the neck, and the other a thrust through the neck. The gunshot wounds were not mortal; death resulted from the cuts in the throat. Two of the bullets were found, and were pronounced to be six-shooter balls. Though no witness heard more than the three shots, and they are already accounted for, a fourth bullet-hole was found in the shirt of the deceased. It passed through the sleeve of the shirt, near the wristband, and some of the witnesses thought it must have been made by a larger ball than those which took effect as already stated.

The defendant and Ben. Perry were summoned by the officer as part of a posse to go in quest of Collier, Goats, and Jennings the same night, and after the murder. Guns were furnished them, and they went; but, after reaching

Jennings's, the officer told them they might go home, and Perry accompanied the defendant to the house of Wash. Williams, the father-in-law of the defendant, whose wife was there. The next day the defendant returned to Round Rock, by himself, and still armed with the gun furnished him the previous night. No injuries were apparent upon his person, except some scratches on his face and a slight one upon his arm. The theory of the prosecution was that the deceased inflicted these scratches when the defendant was cutting his throat; that of the defence was that the defendant received them as he fled through the brush to the camp of the Perrys. Each theory found an advocate in the two doctors who were examined on the trial. One thought them "evidently made by human hands," because they were deepest where they began, and became shallower and more irregular as the nails filled with the skin, whereas scratches made by bushes would become deeper as they progressed. The other physician was of opinion they were too narrow to have been made by finger-nails. A good deal of blood was on the shirt and pants of the defendant. This, according to the prosecution, spurted upon him as he cut his victim's throat; according to the defence, he received it in trying to succor his friend.

The prosecution having elicited from a witness part of the testimony given by the defendant as a witness at the coroner's inquest, the defence introduced the whole of it as taken down on that occasion. After narrating the visit of himself and the deceased to the camp of the Perrys, and the stoppage there of Collier, Goats, and Jennings, his testimony proceeded: "In a few minutes after we went back to our camp, we went to bed. I heard some parties riding off, which I supposed to be those three men. I think they went off in a north-west direction. In some five minutes after we went to bed I heard a noise, and raised up, and just as I raised up I saw two men. Just then they fired; they were about five steps from us; one had a gun,

the other a pistol. When they fired I jumped under the wagon. When I looked around I saw the deceased coming towards me, hallooing, ' O Drew! O Drew! don't let them shoot.' I then ran and met him, and carried him some twenty-five yards, they still following and shooting. I ran into a bunch of bushes with deceased, and when I got there they had overtaken us, and was cutting at us with knives. I then let deceased loose, and ran. I ran up to Mr. Perry's camp. I was excited, and it was dark. I could not recognize the parties that did the shooting and cutting. I think deceased had raised up before he was shot. They were on the west side of the camp. I do not remember how many shots were fired. I recognize the corpse to be that of Harvey Carter. The men that came to the camp looked to be about the same size, — that did the shooting. The deceased had a pistol, but I know there was not more than one barrel loaded. I do not know that deceased had the pistol in his hand at the time the shooting took place. We lay with our heads towards the north. Mr. Kilpatrick found the pistol referred to, this morning, east of where we were lying; the corpse also was east, and the pistol was four or five steps north of where the corpse lay. The pistol was found on the trail on which the deceased was carried up the hill, very near on a line from our camp to Perry's camp."

Carter's pistol, as appears by other testimony, was found by Kilpatrick at a distance of seven or eight feet from the corpse, and in the direction of Perry's camp.

To show express malice, the prosecution introduced Mrs. Adams, who testified that about two months prior to the murder, at the washing-place of the defendant's father-in-law, she heard a conversation between the defendant and his sister-in-law, Miss Dona Williams. Defendant said he would be d—d if Dona Williams and Harvey Carter should marry; that he (defendant) would die and go to hell before she should marry him. " Dona said defendant should not object; and Dona and defendant quarrelled about Carter,

and defendant said he would kill Carter before he (Carter) and Dona should marry, even if he should have to die and go to hell for it." The defendant's wife was present at the time. The defence introduced the defendant's wife and Mrs. McClure (formerly Miss Dona Williams), and they both positively denied that any such conversation ever passed between the latter and the defendant. Mrs. Mc-Clure further states that she and the deceased were engaged, and that the defendant never opposed their marriage; and she and others testified that the defendant, only a week or two before the murder, named his little son after Carter, with whom he was entirely friendly.

As already stated, the jury found the defendant guilty of murder in the first degree, and judgment of death was rendered against him.

*Makemson & Fisher*, for the appellant. The first question presented in the motion for new trial is whether or not there is any penalty attached to murder in the first degree within this State; and if not, why.

If there is, what is that penalty? Is it death, or imprisonment in the penitentiary for life in lieu thereof?

We shall maintain that there is no penalty for murder in the first degree.

By the adoption of the Criminal Code, the punishment of murder in the first degree was declared to be death. Art. 612.

This remained as the only penalty until the 30th of March, 1870, at which time the Constitution of 1869 became operative, when it was so changed that the jury had the power to punish by death, or by imprisonment for life in the penitentiary.

In support of our position, and to show that we have not mistaken the penalty as it existed after the adoption of the Constitution of 1869, we will refer the court to the case of *Murray* v. *The State*, 1 Texas Ct. App. 427, where the

following language is used, to wit: "We are cited to *Dawson* v. *The State*, where it was held 'that all that can be claimed for this section of the Constitution is that it vests in the jury a power of commuting punishment, heretofore vested in the executive. 33 Texas, 492.' We confess we cannot see the distinction sought to be made. Imprisonment for life, whether so declared in so many words or not, was nevertheless, under sect. 8, art. 5, a legitimate mode of punishment for murder in the first degree, whenever the jury in their discretion saw proper to impose it; and so long as it might be legitimately imposed, we cannot see why it was not as much a penalty for the crime as the infliction of death. And the same court which decided *Dawson* v. *The State* must have come to and entertained this opinion, for they subsequently held that the omission of the judge to charge the jury, in a case of murder, that the punishment for murder in the first degree might be commuted to imprisonment at hard labor for life was such error as demands of them a reversal of the case. *Marshall* v. *The State*, 34 Texas, 664.

"To our minds, the conclusion is axiomatic, and seems 'to follow as the night the day,' that so long as murder of the first degree might be punished by imprisonment for life, imprisonment for life was a penalty or mode of punishment for murder of the first degree, recognized by law."

It is true that we must look to the Constitution in order to find that the penalty for murder in the first degree has been changed; but this is immaterial; the effect is the same as if the Legislature had enacted "that murder in the first degree shall be punished with death or by imprisonment in the penitentiary for life," with this difference: if a legislative act, it would have been necessary for the Legislature, in legislating upon this penalty, to have referred to the act sought to be amended, and to have reënacted the section at length; while nothing of this kind is required of the

convention which framed the Constitution. The convention had the power to change every penalty in the Criminal Code if they saw proper to do so ; and it is immaterial by what name this change may be called : 'you may. call it an amendment, a modification,. a power to commute, or a repeal, — the effect nevertheless is felt, and is the same in either instance ; the penalty is gone, and a new one substituted.

The only offence that we had, prior to the adoption of the Constitution of 1869, punished absolutely with death, without an alternative penalty, was murder in the first degree ; and therefore when the Constitution of 1869 speaks of capital offences, — that is, offences punished only with death, — the framers of the Constitution could only have intended to affect the penalty of this particular offence.

As an evidence that they could only have intended to affect this particular offence, all that we have to do is to refer to some of the offences under our Code, to show that it would have been but an idle consumption of time to have intended to affect any thing else. For instance, treason, under the act of 1856, is punished with death or imprisonment for life, at the discretion of the jury. Rape, under the act of 1866, is punished by death, or imprisonment in the penitentiary not less than five years. Arson, in one instance, is punished as murder ; it therefore follows the penalty for murder. If the Constitution had these offences in view, what object could the framers thereof have had in saying that these offences should be punished by death or by imprisonment, when the penalty already attached to each had given that discretion to the jury ?

But, assume that they intended it to operate upon every offence where the penalty could be death, and that they intended to throw around every person charged with so grave a crime its mantle of mercy to protect the criminal against the harshness of future legislation ; then, even, it is admitted that this provision of the Constitution enters into

and becomes a part of every penalty to each offence upon which it operates.

Our theory, then, is that the Constitution of 1869 changed the penalty of murder in the first degree from death absolutely, to death as its maximum and imprisonment for life as its minimum. In other words, the penalty formerly existing was repealed by the creating of a new penalty. In this we believe that we are sustained by authority.

When a statute imposes a new penalty for an offence, it repeals by implication so much of the former as establishes a different penalty.

In the case of *The Commonwealth* v. *Kimball*, 21 Pick. 375, the question arose whether the act of 1838 was so far inconsistent with the Revised Statutes of Massachusetts (chap. 47, sect. 3) as to operate as a repeal of the former by implication. The Revised Statutes imposed a penalty of $20 for persons violating the provisions of the statutes relating to excise, and the act of 1838 imposed a penalty of not more than $20 nor less than $10.

In the case of *Murray* v. *The State*, 1 Texas Ct. App. 429, referred to above, the court has already held that imprisonment for life was, prior to the Constitution of 1876, a part of the penalty for murder, as much so as if it had been a part of the act itself. Bearing this in mind, we will see what the Supreme Court of Massachusetts say as to the effect of this additional penalty.

The court said that " two statutes were passed, at different times, concerning the present case. The former prohibits the forbidden act under a penalty of twenty dollars for each offence; the latter prohibits the same act on pain of forfeiting not more than twenty dollars nor less than ten dollars for each offence. *The former is absolute and imperative; the latter allows a latitude of discretion.* It appears to the court that one is essentially and substantially inconsistent with the other; that the latter statute, by prohibiting

the same act under a lower penalty, though no negative words were used, did in effect declare that it shall not be punished by the higher penalty, and therefore the acts are inconsistent ; that the penalties as they stood in the two acts were equally inconsistent. The former enacted that the offence should be punished by a penalty of twenty dollars ; the latter declared that the same offence should not necessarily be punished by a penalty of twenty dollars, but by such penalty, not more than twenty dollars nor less than ten dollars, as the court should direct. That the provision of the former act by which the penalty was fixed was inconsistent with the provision of the latter, and by the terms of the latter repealed. Smith's Comm., sect. 776.''

That is the rule of interpretation as enunciated when the party was charged with misdemeanor, yet it is the settled rule of interpretation in all cases as to the effect of statutes.

Let us apply the test to this case, wherein a man has been tried, and a verdict returned against him demanding the forfeiture, not of $20, but of his life. If, prior to the Constitution of 1869, the penalty of murder in the first degree was absolute and imperative in its declaration of the death-penalty, not admitting of a latitude of discretion, and after the adoption of the Constitution it was no longer death absolutely, but did admit of a latitude of discretion in allowing the jury to find the defendant guilty, and assess either the death-penalty, or imprisonment for life in the penitentiary, as they should see proper, then we certainly think that a new and entirely different penalty had been prescribed, and, if inconsistent with the former penalty, the former was certainly repealed. And, as we said before, it is immaterial whether this repeal had been effected by the Constitution or by legislative enactment ; because, when we come to consider the construction of statutes as to repeals, there is no distinction to be drawn between statutes as made by a Constitutional Convention and statutes made

by the act of the Legislature. The only thing that we are required to look to is the effect of the repeal.

If the two penalties are inconsistent, or a new penalty, though embracing a former, has been enacted, then the former is as completely wiped out as if it had never existed. *Horan* v. *The State*, 11 Texas, 144 ; Smith's Comm., sects. 767, 776 ; Sedgw. on Stat. & Const. Law, 124, 125, 128, 129.

We have considered the effect of the Constitution of 1869 upon the penalty as it existed before the adoption of that instrument. We will now consider the effect of the new Constitution of 1876 upon the Constitution of 1869, and the act of 1856 prescribing the penalty to murder in the first degree ; and this brings us directly to the " question," is there any penalty to murder in the first degree in this State ?

By the adoption of the Constitution of 1876, every section of the Constitution of 1869 was abrogated which is not found to be engrafted in the former.

The Constitution of 1876 contains no such provision as that of sect. 8, art. 5, of the former Constitution, and therefore the failure to express this provision, or its substance, must be held to be an abrogation of that section.

Therefore the penalty of death as an absolute penalty having been changed or repealed by the Constitution of 1869 prescribing a different penalty, and the Constitution of 1869 having been abrogated by the adoption of the Constitution of 1876, we have to-day no penalty for murder in the first degree, because an abrogation of the Constitution carries with it in its overthrow the penalty prescribed in it, and that also formerly prescribed by the statutes.

It has been held that a statute may be repealed by the abrogation of a State constitution. Sedgw. on Stat. & Const. Law, 128 ; *Pierce* v. *Delameter*, 1 Comst. 17.

By the rule of construction of the common law the abrogation of the Constitution, or, in other words, the repeal of

the statute creating the penalty, would restore the former penalty, and murder of the first degree would therefore be death; but our statute has overthrown this common-law rule by the adoption of another, to wit: whenever one law which shall have repealed another shall itself be repealed, the former law shall not be revived without express words to that effect.    Pasc. Dig., art. 4577.

Therefore the penalty of murder in the first degree cannot be revived by the abrogation of the Constitution of 1869. It is true that sect. 48, art. 16, of the Constitution of 1876 says that "all laws and parts of laws now in force in the State of Texas, which are not repugnant to the Constitution of the United States or to this Constitution, shall continue and remain in force as the laws of this State, until they expire by their own limitation or shall be annulled or. repealed by the Legislature."

This section can and only does refer to those laws in force at the adoption of this Constitution. · No one will seriously contend that its object is to revive every thing found upon the statute-book of this State; and as the penalty had been changed by the Constitution of 1869, and the former penalty repealed, of course this section can have no applicability to the former penalty.    When a statute contains a provision saving from repeal a part of a former statute which had been already repealed, such a provision will be regarded as a nullity, and will not operate as a revivor of the repealed clause thus attempted to be revived.    Smith's Comm. 784 ; *Achley's Case*, 4 Pick. 21.

It is said that statutes of a penal character, and especially those of grave penalties, should never be construed ; because the very fact of construction being necessary shows the uncertainty of the law, and therefore when the law is uncertain, a person should not be convicted.    Not only is this the rule laid down in the text-books, but is the rule prescribed by our statute, which we will call attention to before we are through.    In criminal cases, the question of doubt applies·

with equal force as well to the penalty as to the facts upon which a conviction is sought. In other words, while it is the certainty of the facts which go to establish the guilt, it is the certainty of the penalty which authorizes the punishment; and while if there is a doubt as to whether the facts establish the act the jury must acquit, it is equally true that if the penalty is so framed as to be of doubtful force, no judgment can be pronounced. Smith's Comm. 741.

Because, if we are allowed to extend a penalty to an offence when there is an uncertainty as to whether it has a penalty or not, it is as an eminent judge said: "The fate of accused persons is decided by the arbitrary discretion of judges, and not by express authority of law."

The general words of a penal statute must be restrained for the benefit of him against whom the penalty is inflicted. It is said if the rule be one of the higher sort of maxims that are *regulæ rationales*, and not *positiva*, then the law will rather allow a particular offence to escape without punishment than violate such a rule.

When we turn to our Criminal Code, the very first section we encounter reads as follows: " The design of enacting this Code is to define in plain language every offence against the laws of the State, and to affix to each its proper punishment."

Again, art. 3: " In order that the system of penal law in force in this State may be complete within itself, and that no system of foreign laws, written or unwritten, may be appealed to, it is declared that no person shall be punished for any act or omission as a penal offence unless the same is expressly defined and the penalty affixed by the written laws of this State."

Again, art. 6: " Whenever it appears that a provision of the penal law is so indefinitely framed, or of such doubtful construction that it cannot be understood, either from the language in which it is expressed, or from some other written law of the State, such penal law shall be regarded as wholly inoperative."

Again, art. 9 : " This Code, and every other law upon the subject of crime which may be enacted, shall be construed according to the plain import of the language in which it is written, without regard to the distinction usually made between the construction of penal laws and laws upon other subjects, and no person shall be punished for an offence which is not made penal by the plain import of the words of the law."

These four articles give us the rule by which penal laws in this State must be construed ; in other words, they cut off all construction, and make it the duty of the court, in a case where there is doubt as to the penalty, to acquit the defendant of the offence, the import of which is doubtful.

We therefore believe that, to say the least, the penalty of murder in the first degree is not so certainly established and fixed as to be able " to read it as we run ; " and, to say the least, we are bound to resort to construction, and liberally in behalf of the State, to say that the penalty of murder in the first degree is death. We cannot see how such a construction would be given to the statutes, in the face of the Constitution of 1869, when its effect is regulated not only by the common law and the usual rule in its application to repeals, but is regulated by art. 19, Criminal Code, which says : " No penalty affixed to one offence by one law shall be considered as cumulative of penalties prescribed under a former law ; and in every case when a new penalty is prescribed for an offence, the penalty of the first law shall be considered as repealed, unless the contrary be expressly provided in the last enacted."

This law establishes clearly that this former penalty for murder in the first degree had been repealed by the substitution of a different one, by the Constitution of 1869.

But assuming, for the sake of argument, that in this State the courts are permitted to construe statutes of a penal character, yet the construction must be of the most strict and rigid nature when the life of a human being is in jeopardy. If the penalty has been abrogated by the Consti-

tution of 1876, then no punishment for this offence can be inflicted, because art. 15 of the Criminal Code declares not.

We see but one way to avoid holding that the penalty for murder in the first degree is gone, and that is, as contended by some writers upon constitutional law, to draw the distinction between that which is strictly organic or constitutional and that which is purely of a legislative nature, and hold that that which is of a legislative nature in the Constitution is not to be affected by the change of constitutions; and that that portion of the Constitution of 1869 which affected the penalty for capital offences, being of this legislative character, still remains unaffected by the Constitution of 1876, still giving the jury the right to substitute imprisonment at hard labor in the penitentiary in lieu of the death-penalty.

*Thomas Ball*, Assistant Attorney-General, for the State.

CLARK, J.    The position assumed in the briefs of counsel for appellant, and maintained upon principle and authority, that by a change of constitutions in 1876 the penalty for murder in the first degree was entirely abrogated, and that until the adoption of the Revised Penal Code, which took effect on July 24, 1879, there was no penalty affixed to the offence of murder in the first degree by the laws of this State, has already been carefully considered and substantially settled in the case of *Cox et al.* v. *The State*, decided at our last Austin term, but not yet reported.    A mere reference to the opinion in that case might well suffice for a proper disposition of the question in this case; but as the position is so strenuously insisted upon, and the question seems still regarded as open, it is deemed not inappropriate to reëxamine the question, and to give a further expression to the views entertained by this court, in addition to the views already expressed by the learned judge who delivered the opinion in the case referred to.

Prior to the adoption of the Constitution which took

effect on the thirtieth day of March, 1870, the punishment for murder in the first degree was fixed by the law at death. Penal Code, art. 612a. Art. 5, sect. 8, of that instrument provided as follows: "In the trial of all criminal cases, the jury trying the same shall find and assess the amount of punishment to be inflicted, or fine to be imposed, except in cases where the punishment or fine shall be specifically imposed by law; *provided*, that in all cases where by law it may be provided that capital punishment may be inflicted, the jury shall have the right, in their discretion, to substitute imprisonment at hard labor for life." The Constitution of 1870 was abrogated by our present Constitution, which went into operation on the eighteenth day of April, 1876, and which omitted the above provision altogether.

It is now contended that when the Constitution of 1870 became the organic law of this State, the above provision became a part and parcel of the law affixing a penalty to the offence of murder in the first degree, interwoven and blended with the statute as inseparably and thoroughly, and perhaps more solemnly, than if placed there by ordinary legislative enactment, and that with its repeal, in 1876, the penalty for murder in the first degree fell with it. In other words, that between the eighteenth day of April, 1876, and the twenty-fourth day of July, 1879, our law affixed no penalty whatsoever to the offence of murder in the first degree, and that such offences committed within the stated interval cannot now be punished; or, if this be not so, the provision in the Constitution of 1870, having been carried into the statute as a part of the penalty for murder, was continued in operation by the provision of art. 16, sect. 48, of our present Constitution, which continues in force all existing laws and parts of laws not repugnant to its provisions; and that the law applicable to this case was not given to the jury, there having been no instruction as to the alternative penalty for murder in the first degree.

. Authorities are not necessary to support the proposition that in the interpretation of written constitutions, as well as of statutes, the true inquiry is to ascertain the intention of the law-making power, in order to give it proper effect; or, in the language of Judge Cooley, "the object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it." Cooley's Const. Lim. 55. True, this intent is to be found in the instrument itself; but here the rules of construction as applicable to constitutions and to statutes diverge, and those who are charged with the duty of expounding the former are not authorized to apply to the language employed any technical or abstruse meaning, but are required to give effect to its plain and ordinary signification. Says Judge Story, in his Commentaries: "Constitutions are not designed for metaphysical or logical subtilties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of life, adapted to common wants, designed for common use, and fitted for common understanding. The people make them, the people adopt them, the people must be supposed to read them with the help of common sense, and cannot be presumed to admit in them any recondite meaning, or any extraordinary gloss." Story on Const., sect. 451. Or, as said by the court in Alabama, quoting from Chief Justice Gibson: "A constitution is not to receive a technical construction, like a common-law instrument or statute. It is to be interpreted so as to carry out the great principles of the government, not to defeat them." 34 Ala. 238.

What, then, was the intention of the people in adopting the constitutional provision in question? Was it to amend the statutes in force as to capital felonies, and to prescribe in the organic law that the punishment for those offences should be changed? If so, it is at least reasonable to infer

that they would have employed language unmistakable in its simplicity. In its adoption they were not performing an act of ordinary legislation, but were engaged in the establishment of fundamental principles of government for themselves, reserving to themselves such powers as they were not willing to delegate, and providing the general features of that system which in their judgment was best conducive to their future happiness and prosperity. In their sovereign capacity, and keeping even pace with the humane spirit of the age, they provided that their jurors, in the trial of persons charged with capital felonies, and notwithstanding the legal penalty affixed to the offence might be death absolutely, might yet, in the exercise of a humane discretion granted them directly by the people themselves, substitute imprisonment for life for the penalty affixed by law. This privilege or discretion, which may be styled a part of the penalty or one of the penalties in all cases punished capitally under the law, partook rather of the grace of the sovereign which decreed its exercise, in all proper cases, in spite of the fixed and absolute penalty prescribed by law, and in mitigation thereof. It was not only proper but necessary that, in all prosecutions for capital offences committed during its existence in the organic law, the jury should be informed of its existence as a part of the law applicable to the case, in order that they might exercise their discretion in affixing the punishment; but it by no means follows as a necessary consequence that it became so firmly imbedded in the statutes, as part and parcel thereof, that the abrogation of the organic law in which it was contained left it transplanted in those statutes, and firmly imbedded as a part of the fixed law for that class of offences. We know of no rule of law tending to sustain such construction.

In the adoption of our present Constitution, the people omitted this provision contained in the former instrument, and expressly continued in force all laws not repugnant to

the provisions of the new instrument. Const., art. 16, sect. 48. The effect of the adoption of the new Constitution was an entire abrogation of the old, except as to provisions reënacted in the new, and such provisions as by the terms of the new Constitution were continued in force and operation. *The State* v. *McAdoo*, 36 Mo. 454; *Smith* v. *Davis et al.*, 28 Md. 244; *Pierce* v. *Delamater*, 1 Comst. 18. If the terms "all laws and parts of laws," as employed in sect. 48 of art. 16 of the Constitution, and which were continued in force not being repugnant to its provisions, can be construed to include the provision in the former Constitution relating to the substitution of imprisonment for death in capital cases, as not repugnant to the provisions of the present Constitution, other provisions of the abrogated instrument could with equal propriety be invoked as existing law, and the basis of rights accruing and to accrue, until the Legislature might see fit to extinguish them by express repeal, if that was competent. And the will of the people who caused to be framed and adopted an instrument of organic law, as an entirety, would be set at naught by the resurrection of provisions in the dead instrument which had been designedly discarded and omitted from the new under the well-grounded assumption that such omission operated as an abrogation. Even a statute which is evidently intended as a substitute for a former statute, and which omits any provision contained in the former statute, is uniformly held to operate a repeal of the provision omitted.

Certainly there can be no mistake as to the intention of the people in the adoption of the present Constitution as an entire substitute for the one under which they had previously lived. And such is the legal effect of the adoption of a new Constitution, according to all the authorities to which we have had access. Say the Supreme Court of Missouri in the case of McAdoo, above cited: "The present Constitution, when it took effect on the fourth of July last,

was from that date the supreme law of the land, and applied to all subjects not exempted from its operation. The old Constitution was entirely superseded by the new, and its power or authority cannot be invoked in the matter." "A constitution," say the Court of Appeals of New York, " is to be held as prepared and adopted in reference to existing statutory laws, upon the provisions of which in detail it must depend to be set in practical operation." *The People* v. *Jackson*, 47 N. Y. 380. See also *Collins* v. *Tracy*, 36 Texas, 546.

To the same effect is the language of Judge Thurman, in delivering the opinion of the court in *Cass* v. *Dillon*, which involved the continued existence of a statute under a new constitution. Says this eminent constitutional lawyer: " If the laws of a conquered country remain in force until repealed, so far as they are consistent with the government of the conquerors, *à fortiori* is it true that the laws of a State survive a peaceable change of its constitution, effected by its own people, and not varying the general structure of its government, to the full extent to which they are consistent with the new order of things." 2 Ohio St. 610.

But conceding the point insisted upon in this case, that the provision under discussion, in the Constitution of 1870, was not fundamental but legislative in its character, we cannot hold that it survived the abrogation of that Constitution. Under that aspect of the case, its legal effect may be thus stated: Under the act of 1858 the punishment for murder in the first degree was fixed at death. By legislative act of the convention of 1869 it was provided, not by an amendment of the original law, but by supplemental act, that, notwithstanding the previous law, which is left in force, imprisonment for life may be substituted for the death-penalty. After the lapse of six years the supplemental act is repealed. How is the other separate and independent provision affected by such repeal? Without such constitutional provision, it was competent for the Leg-

islature at any time to have supplemented the act of 1858 by a separate statutory provision of similar import to the one contained in the Constitution, and a subsequent legislative repeal of the supplemental act, without reference to or qualification of the former law, could not be held to have affected that former law. If, therefore, this provision was legislative, it was independent in its nature, not intended to be and become a part of the statute in force or thereafter passed as to capital felonies, and its repeal or abrogation left the former statutes fully vitalized and continued in force and effect by express provision in the new Constitution. That such was the clear intention of the people in the adoption of the present Constitution is unmistakable; and neither this court nor any other court could find justification in overriding this plainly expressed intention, and in giving to this act of the people a strained and wholly technical signification never contemplated or intended, and which leads to an absurdity in that it would inevitably defeat the great principles of government, among which the protection of life is perhaps the most essential. There was no error in failing to charge the law as contended for.

It is no new principle in the law of this State that to justify a conviction upon circumstantial evidence alone the facts relied on must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of guilt. *Barnes* v. *The State*, 41 Texas, 342; *Black* v. *The State*, 1 Texas Ct. App. 391. If this be so, certainly a jury called to pass upon a case of that character should be informed of the rule as a part of the law applicable to the case. An ordinary charge upon the law of reasonable doubt, copied from the statute, cannot convey to their minds a clear conception of this exaction of the law, when a conviction is sought upon circumstantial testimony alone; and without some definite rule for their guidance — a rule which will serve to impress itself on their minds, and cause them to weigh most

carefully all the facts, isolated or connected, from which they must reach their conclusion by reasonable inference — they are not unlikely, in many instances, to found their verdict upon strong suspicion or mere probability, which will not suffice under the law.   *Tollett* v. *The State*, 44 Texas, 95.

In prosecutions for ordinary felonies, juries are required to be instructed as to the law of reasonable doubt, even when the evidence is of a positive character and can lead to but one legitimate conclusion.   It is much more essential, in a prosecution in which nothing is proved by positive testimony save the *corpus delicti*, that the jury be further instructed as to the conviction which must impress itself upon their minds, drawn by inference from the circumstances in evidence, before they can say that, beyond a reasonable doubt, the prisoner before them perpetrated the act.   And it is believed that the adjudged cases in our State furnish no instance of a conviction for a grave felony upon circumstantial testimony alone, unless the charge of the court plainly directed the jury as to the principles of law which should govern them in reaching their conclusion; and we have already held it error to refuse a charge of this character when asked in a proper case.   *Harrison* v. *The State*, 6 Texas Ct. App. 42.

In the case of Burrell, 18 Texas, 713, the judgment was reversed as to the appellant Burns because the only evidence tending to inculpate him was circumstantial, and the court failed to instruct the jury upon its effect, notwithstanding they were instructed that " circumstantial testimony must tend closely to prove the fact, or it is not of itself sufficient, but may still be entitled to great weight in connection with positive testimony."

In *Cave* v. *The State*, 41 Texas, 182, it is laid down that, in cases dependent upon circumstantial evidence, full instruction upon that branch of the law is requisite and essential.   It is noticeable that in that case the evidence was not

wholly circumstantial, and yet the jury were substantially instructed as to that species of evidence.

In *Brown* v. *The State*, 23 Texas, 195, in which the evidence was wholly circumstantial, the rule in Webster's case was not given to the jury; but the learned judge who presided on the trial, after stating the law as to reasonable doubt very fully, instructed the jury that all the material facts proved to their satisfaction ought to lead to the conclusion that the prisoner did the deed, to the exclusion of a reasonable belief that he did not or that some other person did it, and that if the evidence satisfied their minds and consciences that the accused did kill the deceased, and did not show that some other person had a motive to do it and might have done it, then it was sufficient to find the fact.

It is true that in *Chester* v. *The State*, 1 Texas Ct. App. 702, this court held that in the case before them it was not necessary for the jury to be instructed as to circumstantial evidence; but in that case, which was a case of theft, the evidence was not wholly circumstantial, and the decision must be restricted to the case before the court, and not be construed as the enunciation of a general principle for the guidance of courts in all cases.

The usual rule in relation to circumstantial evidence, which is a familiar one to the profession, cannot be deemed a philosophic dissertation upon the nature and effect of evidence, and therefore within the prohibition of the Code as an invasion of the province of the jury, but is to be regarded rather as a rule of law applicable to all cases in which a conviction is sought upon circumstantial evidence alone, and the giving of which to a jury, in the general language usually employed, cannot specially affect any one fact in evidence or materially prejudice the prosecution. And when given, enuring solely to the benefit of the defendant, he cannot be heard to complain. It is only another application of the doctrine of reasonable doubt, which the humanity of the law vouchsafes to prisoners on trial, when

the evidence against them is wholly circumstantial ; and an instruction embodying it simply informs the jury what degree of certainty the facts in the evidence must produce in their minds before they can convict, just as a charge upon the reasonable doubt does in ordinary cases. The failure of the court to give an instruction upon this branch of the law was error which will require a reversal of the judgment.

The general charge of the court is complained of as not embodying an accurate definition of murder with express malice, and in failing to define clearly the distinction between the two degrees of murder. As this opinion is already extended in the discussion of other questions, a critical analysis of the charge will not be undertaken. But we are of opinion that, upon another trial, the better practice would be for the court to conform its charge to established precedents in our State, and not undertake a condensation of principles which might omit essentials. While the definition of murder in the first degree as given to the jury might successfully withstand careful analysis, and be upheld as containing the condensed essence of the authorities upon the subject, we are of opinion that the mere difficulty experienced in the attempt at such adaptation sufficiently indicates that fuller explanations should have been given to the jury as to the necessary constituents of the two degrees of murder.

It is never safe to depart from established authorities in giving instructions to a jury, and in prosecutions for murder in this State, the law has been so fully and plainly settled by repeated decisions that courts cannot err if they but employ the language of standard cases in the exposition of principles which are to govern the jury. The other errors assigned are not deemed material.

Because of a failure of the court to charge the law applicable to the case, the judgment is reversed and the cause remanded.

*Reversed and remanded.*