L. M. NOFTSINGER *v.* THE STATE.

1. MURDER. — Appellant was tried since the Revised Codes took effect, for murder committed prior thereto, but filed his written election to receive the penalty prescribed by the law in force when the offence was committed, which was death without alternative, instead of death or confinement in the penitentiary for life, as provided by the Revised Penal Code, art. 609. The court below instructed the jury that if they found the defendant guilty of murder in the first degree, they would simply so say by their verdict, without concerning themselves about the punishment. *Held,* correct.

2. EVIDENCE may, by express authority of the Code, be admitted at any time before the argument is concluded. "if it appear that it is necessary to a due administration of justice." The exercise of the discretion thus conferred on the court below will not be revised on appeal, unless it be made to appear that the discretion has been abused to defeat the ends of justice.

3. CIRCUMSTANTIAL EVIDENCE.—In cases dependent on circumstantial evidence exclusively, greater latitude is properly allowed in the presentation of the evidence than when direct and positive testimony is relied on for a conviction. Strange conduct, or unwonted agitation and emotion of the accused may be competent evidence for the prosecution in such cases. Note the apposite illustration afforded in the present case.

4. PRACTICE.—Statements elicited by a party from his own witness are legitimate matter for the cross-examination.

5. ACCOMPLICE TESTIMONY.—Concealment of knowledge that a felony is to be committed does not make the party concealing it an accessory before the fact, nor necessitate corroboration of his testimony.

6. FACT CASE.—See circumstantial evidence held sufficient to support a conviction for murder in the first degree, and to exclude all reasonable doubt.

APPEAL from the District Court of Cooke. Tried below before the Hon. J. A. CARROLL.

The indictment charged Noftsinger, the appellant, with the murder of Willis Cline, on August 7, 1878, by shooting him with a gun. The trial was had in August, 1879. The defendant filed a " motion " in which he declared his election to be tried under the law in force before the Revised Codes took effect. Many witnesses were examined, of whom none save the victim's wife was present at the scene of the assassination, and as it was perpetrated in the night, she was unable to state by whom it was committed. The evidence for the State, therefore, was purely circumstantial, but elicited from the jury a verdict of murder in the first degree; upon which the court, in conformity with the law anterior to the Revised Codes, adjudged the death-penalty.

Mrs. Helen Cline, the widow of the deceased, was the first witness introduced by the State. She testified that he died of a gunshot wound, at his home, about four miles north of Dexter in Cooke County, between ten and eleven o'clock in the night of Wednesday, August 7, 1878. The

weather being warm, they had put a mattress on the floor of a porch situated on the north side of the house, and she was asleep by her husband's side at the time he was shot. Her first sensation was the sound of something which seemed like the bursting of a cap. She was stunned, and felt as though she was suffocating from the smoke of gunpowder, and on waking sufficiently she saw that the top part of her husband's head was lying over on his face. She replaced it, and got a dipper of water and washed his face; and then saw that he was dead. She screamed and tried to alarm the neighbors; and then started to Mrs. Sparkman's, a near neighbor, and on the way met that lady coming, and told her what had happened, which so alarmed Mrs. Sparkman that she returned to her own home. Witness then went back to her house, lighted a lamp, and again looked at her husband; and once more started to Mrs. Sparkman's, and on the way was met by that lady, her daughter, two of her sons, and Mr. Boyd, and with them came back again to her house.

Witness and her husband had been married only three days over a month at the time he was murdered. She had known Noftsinger, the defendant, for two years or more previous to that event. At one time she had been engaged to him, and they expected to marry in the fall of 1878; but the engagement was broken off about March of that year by the witness, on account of his complaints about her dancing with Cline, to whom it appears she had been engaged before her engagement with Noftsinger. In the spring of 1878, before her engagement with Noftsinger was broken off, he wrote her a letter in which he stated that Mr. Cline was a low-down pup, and that he would not keep company with a lady who would dance with such a man. Subsequently, at the defendant's request, she returned to him all his letters to her, except the one about Mr. Cline; and he would not believe her explanation that it was lost, but insisted that she had sent it to Mr. Cline, and said if she had,

and Cline refused to give it up to him, he would kill him. Witness said to him, "You surely would not kill a man for such a cause as that;" to which he replied that he would; that when he was in a good humor he had as good a heart as anybody, but when he was mad he had as mean a heart as ever beat in a human bosom.

On Tuesday night of the week before the murder, just as she and her husband had gone to bed, a gun was fired close by the house, and next morning they saw shod-horse tracks near the corner of the lot. Mr. McGuinn had formerly lived in the house, but had moved away three or four weeks before the murder. The night of that event somebody suggested that the assassin had mistaken Mr. Cline for McGuinn, whose life had been threatened by many enemies.

On the cross-examination, Mrs. Cline stated that she had not told, at the examining trial, of the defendant's threat to kill Mr. Cline if he did not give up the letter. That trial was held within a few days after her husband's murder, and her distress then disabled her from remembering minutely all that had occurred. The night of the murder was a bright night; the moon was shining.

Charles Craig, for the State, testified that about dusk on Tuesday or Wednesday evening, a week before the murder, he met the defendant about a half or three-quarters of a mile from Dexter, on a road which passed within half a mile of where Cline then lived. Defendant was riding a small gray horse. He and witness exchanged salutations, but no conversation passed between them. Between where the defendant was and Cline's, the road forked, and witness could not say which fork the defendant took.

T. Hill, for the State, testified that he lived within a quarter of a mile of Cline when the latter was murdered. On Tuesday night in the week previous to that event, after dark and after he had taken his supper, he saw a man with a gray horse standing in the road near the house, who inquired of witness the way to Dexter; and on being directed

to the Dexter road, about two hundred yards distant, went off towards it. Just as he rode off, witness asked him his name, but received no reply, and could not say that the man heard his inquiry, though it was loud enough. After the lapse of about sufficient time for the man to have reached the Dexter road and return from it to witness's house, some one riding a similar gray horse came past the house and went on towards Cline's; and in a half or three-quarters of an hour, witness heard the report of a gun or pistol in the direction of Cline's house, and within a few minutes a man riding a small gray horse came riding down a ravine which leads from that direction to the country road at witness's house; and the man, on reaching the country road, turned east and went towards the road which leads to Dexter. The appearance and gaits of the horse or horses thus repeatedly seen by the witness were similar. The next morning he examined the road where he had first seen the gray horse, and there found tracks of a horse which was shod all around. He could not say positively that the horse he first saw was a gray; it was of a light color, and may have been a light dun. Witness knew the defendant, but could not swear he was the man thus seen on either of the three occasions. He thought, however, that the horse was the same on each of them.

Mrs. Hill, wife of the last-mentioned witness, testified substantially as he did, but added that she was well acquainted with Noftsinger, the defendant, and knew his voice; and when the man was getting her husband's directions to Dexter, she thought she recognized his voice as Noftsinger's, and told her husband, at the time, that the man was Noftsinger.

J. C. Darnall, for the State, testified that he loaned the defendant a medium-sized, small gray horse, shod all around, on the Tuesday or Wednesday of the week preceding the week in which Cline was killed. Defendant said he wanted the horse to ride out two or three miles. Witness

did not know whether the defendant rode the horse or not, but he did not return him until the next day.

B. Bennett, for the State, testified that the defendant applied to him for the loan of a pistol two or three days before Cline was killed. Witness had no pistol to lend to the defendant, but asked him if any thing was the matter; to which he replied, " No, nothing much."

Lewis Williams, for the State, testified that, on the day before Cline was killed, the defendant employed him to go after E. S. Gardner (who is separately indicted for the murder of Cline), whom he wanted to do some hauling; and he instructed witness to tell Gardner to be sure to come that night. The night on which Cline was killed, witness saw Gardner and the defendant, after dark, talking behind Whittington's store, in which the defendant was a clerk. Later and about nine o'clock of the same night, witness was talking to Julia Love in a lot adjoining the lot behind Whittington's store, when the defendant, walking half-bent, and having something like a walking-stick in his hand, came through Whittington's lot behind his store, and crossed over the fence into the lot and close to where witness and Julia Love were talking. She asked witness who that was, and he told her it was Mr. Noftsinger; and witness thought that George Porter, who was in the lot and close by, heard his reply to Julia Love. Witness did not make the trip after Gardner, because just as he got ready to start Gardner came to town.

W. S. Barnes, testifying for the State, said that he lived a half or three-quarters of a mile from Dexter at the time Cline was killed, which event took place in the night of Wednesday, August 7, 1878. On the previous night (Tuesday, August 6), just after dark, witness started on horseback to Dexter. About half-way he met the defendant, who was on foot, and they stopped in the road. Defendant said he was on his way to see witness at his house, but would turn back with witness to Dexter. They proceeded about

a hundred and fifty yards towards Dexter, when defendant stopped by the roadside, and said he would see witness in town and would have a talk with him. In a few minutes after witness reached Dexter, the defendant came and asked him into a saloon to take a drink; after which they went out behind the house, and the defendant said he was going out the next night to have some fun, and that he wanted witness to go with him. He said he was going three or four miles north of Dexter, but did not tell where to, nor what kind of fun he was going to have. He asked witness to come to town again the next night. In compliance with the request, witness did come to town the next night, and again took a drink with the defendant at a saloon just east of Whittington's store, and back of which is an enclosed lot which is separated by a fence from the lot behind the store. They went into the lot behind the saloon, and the defendant got over the fence into Whittington's lot, while witness stopped in the lot in rear of the saloon, and by the fence. Defendant told witness that he was going out north three or four miles, and wanted witness to go with him. Witness asked him where he was going, but he would not tell. He said he was going to get away with a man; that a man had deprived him of his pleasure, and that he intended to deprive that man of his. Witness told him that he would not go with him if that was what he wanted. He then said 'that he was not going that night; "That is all right, Gardner is going with me any way, and too many fingers in a pie spoils it." Witness told him that if he intended to get away with a man the way witness thought he did from the way he talked, that he (witness) would have nothing to do with it; and said to him, "If you do that, they will catch you and break your d—d neck." During the conversation, defendant said he had always regarded witness as a brave man, and for that reason wanted him to go with him. When witness said he would not go, the defendant asked him to say nothing about what had passed between them, and wit-

ness promised that he would not. Witness asked if there were any No. 8 shoes in the store, and he replied that there was not, and walked off towards the back-door of the store. Witness walked off the other way, and saw no more of the defendant that night. In the conversation of the previous night the defendant asked witness where he (witness) could get a horse to ride the next night. Witness replied that he could get one from Tally, out at Whittington's pasture; and defendant said he could get one there too.

On cross-examination, Mr. Barnes said that about Dexter he was generally known as "Gas Barnes," because, he supposed, he was a great talker. He and the defendant were well acquainted, but had never slept or worked together, or been confidential with each other, though they had had some secret talk. After Cline was killed and Noftsinger and Gardner arrested, witness told R. M. Bourland, Sheriff Ozment, and perhaps some others, what Noftsinger had said to him. To others he said that he knew nothing about it; for which his reason was that he had understood that Gardner belonged to a horse-thieving party, numerous in those parts, and he was afraid of them. Defendant never told witness who it was he intended to get away with, nor what he meant by getting away with a man. The defence, as part of their cross-examination of this witness, introduced his testimony at the examining trial, which showed, in several minor matters, inconsistencies with his testimony at the bar.

J. C. Tally, for the State, testified that he, at the time Cline was killed, lived about three-quarters of a mile from Dexter, on a place where there was a pasture, which then contained several horses, and among them a horse of Whittington's which was shod all around. Between sundown and dark on the night of the murder, a man came with a bridle or halter, and inquired for Whittington's horse, which witness showed him, and he caught and took the horse away. He borrowed from witness a saddle-blanket, to ride to Dex-

ter, and said he would return it the next morning along with the horse. Witness's eyes being sore, he could not see well at the time, and paid no attention to the man. Witness had no control over the horse, and the man did not ask his permission to take it. When witness got up the next morning, the horse was in his yard and garden, and the blanket hanging up in a tree near the pasture gate, about a hundred yards from the house. Witness was not then acquainted with Gardner, but saw him very soon after he was arrested, and observed that his hat and shirt were like those of the man who got the horse, and that he wore his pants in his boots, as did the man who got the horse ; but witness could not say that Gardner was the man spoken of.

J. M. Winters, a witness at the examining trial, having since died, the State introduced his evidence thereat. It appears therefrom that he was a deputy-sheriff, and, the next morning after Cline's murder, assisted R. W. Bourland in searching for evidences about the scene of the crime. They found around and near the premises, and along the road from there to Dexter, some peculiar horse-tracks, and subsequently examined the tracks of a mare belonging to Gardner, and believed them to be the tracks of the same animal. The tracks near Cline's were barefooted tracks ; but Gardner's mare, when they saw her, had shoes on her fore-feet. This apparent confutation of their conclusion, however, was explained by another witness, who, early in the morning after the murder, saw a blacksmith putting shoes on Gardner's mare. Winters went to Dexter to assist in the arrest of Gardner and Noftsinger, and the first man who accosted him was Gardner, who asked him about the murder and inquired who was suspected of it. Noftsinger soon after sent word to witness to come over and see him at Whittington's store ; and on witness doing so, Noftsinger took him into the back room and asked him who people thought did it, and if any tracks were found about Cline's place. Gardner and Noftsinger had not then been arrested ;

they both seemed uneasy and their talk was excited. Noftsinger told the witness that he could have killed Mr. Cline once if he had wanted to; that he and Cline had a fight at a party.

R. M. Bourland, for the State, testified that he went to Cline's about sunrise on the morning after the assassination, and found the deceased still lying on the mattress. His description of the corpse is even more ghastly than Mrs. Cline's. The blood and brains were spattered on the wall up to the roof of the porch and along the under side of the roof. He found some shot on the bed and floor; they were mashed, and seemed of different sizes, some being as large as large-sized buckshot. He also picked up from the bed a piece of white tissue paper, which appeared to have been used as gun-wadding and fired out of a gun. His account of the horse-tracks concurred with that of Winters, already given. He arrested Noftsinger about ten o'clock in the day, and thought him the worst scared man he had ever seen. He searched Whittington's store, and found under the counter a double-barrelled shot-gun, the left barrel of which appeared to have been recently discharged, judging by the indications at the muzzle and the tube. The right barrel was still loaded, and witness drew out the charge, and found the wadding to be white tissue-paper, exactly, so far as he could tell, similar to that he found on Cline's bed; and he produced the two pieces of paper of which he spoke. He also took from the right barrel nineteen buckshot, among which were four different sizes. That same morning, but before the arrests, he and Barnes were in Whittington's store when a man came in and did some trading with Noftsinger, who, as soon as the man went out, asked Barnes who the man was, adding that he had sold him some goods on the order of another person, and did not ask him his name. Barnes told him he did not know who the man was, and further said to him, "What is the matter with you to-day? You must be crazy; you sold that

woman, awhile ago, more calico than she paid you for. You had better go off and go to bed." Noftsinger made no reply, but turned and walked off. When the gun was found under the counter, the left barrel, which seemed to have been recently discharged, had been reloaded with squirrel-shot. Witness drew out this charge, and found the wadding to be newspaper.

By W. F. Whittington, the owner of the store in Dexter, the State proved that he was absent from home when Cline was killed, having started the previous morning to Sherman with a wagon. He had occasionally hired Gardner to haul for him, but when he started to Sherman he left no instructions or authority with Noftsinger to employ Gardner or any one else to do any hauling. On the contrary, just before starting he told Noftsinger to tell Gardner, if he should see him, not to apply to witness for any more work. Defendant had authority to use witness's horse and saddle at any time, and in witness's absence had the charge of his affairs. Defendant had been in his employ for nearly two years, and bore a good character as a peaceable and law-abiding man.

E. W. Conrad, testifying for the State, said that just after breakfast in the morning succeeding the night of the murder he saw a blacksmith shoeing Gardner's mare. This witness also stated that the gun found by Bourland in Whittington's store belonged to him (the witness), and had been borrowed from him by Noftsinger about a week before the murder, to kill cats with. Witness next saw it in Bourland's possession the day after that event, and the left barrel had then the appearance of having been recently discharged.

This witness, when Cline was killed, was a merchant in Dexter, and occupied a storehouse nearly fronting Whittington's, and having a porch in front of it, upon which he put his couch and went to bed the night of the murder. After awhile he was aroused by the barking of a dog, and, looking around, saw a man coming up the street from the west;

whom at first he did not recognize, but when he came nearer he saw it was the defendant, who stepped up on Whittington's porch, and, as witness thought, unlocked and relocked the front-door of Whittington's store. He then turned and went to a double gate leading into the lot behind that store, opened the gate, and entered the lot. In a few minutes, he returned through the gate, crossed the street, and walked off in a northerly direction. In a very short time, he came back from that direction, crossed the street, and entered the gate, carrying something which witness took to be a saddle. In a little while, witness heard the back-door of Whittington's store open, and some one walk through to the front door, open it, and step out on the porch. This was the defendant; witness hallooed at him, saying, "Hello! young man, what are you doing there? I've been watching you." He replied, "That is all right," went in the house, shut the door, and witness saw no more of him that night. About five minutes afterwards, Gardner came riding up from the west, dismounted at the gate behind Whittington's store, opened it, and led his horse into the lot. The witness does not exactly fix the hour of these movements of the defendant and Gardner, but gives *data* which imply that it must have been nearly or quite midnight. Doubtless the prosecution inferred that those parties were returning from Cline's after accomplishing the murder.

On his cross-examination, the witness could not say whether his gun was loaded when he loaned it to the defendant. He did not see a gun in the hands of either the defendant or Gardner the night of the murder. He also gave the defendant an excellent character as a peaceable and law-abiding man, previous to this charge against him.

The foregoing is the substance of the evidence for the State, omitting, of course, a great deal of detail and collateral matter of no special significance.

The defence first introduced Julia Love, who remembered her interview with the State's witness, Williams, the night

Cline was murdered; but she positively denied his state-
ment about the defendant passing near them on that occa-
sion, and all his testimony connected therewith.

George Porter, to whom the witness Williams referred as
a by-stander who probably overheard the conversation be-
tween him and Julia Love, testified for the defence that he
saw Williams and her talking together early in the night of
the murder, but did not see Noftsinger pass them, or hear
any mention of him by Williams or Julia Love. But wit-
ness heard Williams say something about it the next morn-
ing. The State, in the cross-examination, drew out of the
witness what was said by Williams the next morning, which
was that he (Williams) saw Noftsinger, the night before,
get over the fence from Whittington's lot into Dunlap's
yard. This was said by Williams early in the day, and be-
fore the arrest of the defendant and Gardner.

The defence introduced a witness who testified that he
knew the general reputation of the State's witness Williams
for truth and veracity, and that it was bad. On cross-ex-
amination, his reason for believing it bad was the company
which Williams kept. His view of the matter was that a
man's reputation for truth and veracity is good if he works
and makes a good living and has money; but bad if he is
lazy, does not work, and has no money.

Many witnesses for the defence concurred in giving the
defendant an excellent character and reputation in all
respects. Ten of them were prominent citizens of Bote-
tourt County, Virginia, who had known the defendant there
until he left for Texas, some two years before the assassi-
nation of Cline. The defence closed by putting in evidence
the indictment charging Gardner, as a principal, with the
murder.

The opinion discloses all special matters germane to the
rulings.

*C. C. & C. L. Potter*, for the appellant. The first
point we will call the attention of the court to is raised

by the second assignment of error, and relates to the ruling of the court on the objection of appellant to that part of the testimony of the witness R. M. Bourland in which he states what one Barnes said to appellant in Whittington's store the morning after the killing. We recognize the full force of the rule that permits the State to prove not only what appellant said in a conversation, but what others also said in the same conversation. But we understand this rule to be based on two reasons, one of which is that it is necessary to prove what others said, who are engaged in the conversation, in order to fully understand the exact meaning of the words of the party on trial; the other is that a party is bound by what others say with reference to himself, in his presence, if he does not deny or repudiate it. When these reasons fail, like all other rules, this rule ought not to be invoked.

We do not think that any sound reason can be given for the admission of this testimony. This statement of Barnes is not necessary to understand any thing said by appellant; nor was there any thing in the remark of Barnes that could reasonably have called forth any reply from appellant, or bind him by acquiescence; nor could the appellant be supposed to think that the remark of Barnes had any reference to the murder of Cline, or his connection with it. This seems to be an effort to get before the jury the opinion of Barnes as to the conduct and appearance of the appellant on the morning after the killing. The State had an opportunity of availing herself of this gentleman's opinion on this subject when he was on the witness-stand, and that supported by the sanction of his oath, without resorting to this hearsay process. The testimony tended to prove no fact in the case, nor to shed any light upon it, but resulted in injury to appellant by prejudicing him in the minds of the jury.

We think the court below committed a very great error in permitting the witness George Porter to testify as to the import of a conversation between himself and the wit-

ness Lewis Williams on the morning after the killing.
We think this testimony purely hearsay, and we know of no
rule of law that would justify its admission.   The appellant
had introduced no part of said conversation, though it is
true that, in answer to appellant's question as to whether
he heard the witness Lewis Williams, on the night of the
killing, speak of seeing the appellant pass by, he replied,
" No, but that he heard him say something about it next
morning."   The part of the answer that recites this con-
versation was not in response to appellant's question, and
he ought not to be held responsible for it.   But it only
recites the fact of a conversation having occurred between
them on this subject, without stating any part of the con-
versation.   The State had no right to strengthen or cor-
roborate the testimony of the witness Williams in this
manner.   There may be some law and reason, where a wit-
ness is sought to be impeached by proving contradictory
statements, to permit proof that he had frequently made the
statement out of court that he made on the stand.   But it
is a strange rule indeed that will allow a party to strengthen
the testimony of a witness by proving that he had told the
same story out of court that he tells in court, when the only
effort to destroy the testimony of the witness is by the
testimony of other witnesses who were present and contra-
dict him directly as to the facts testified to by him.   There
can be no doubt but this testimony greatly influenced the
minds of the jury against the appellant.   One of the most
important facts for the State to establish, and one that
great effort was made to establish, was that appellant was
out of his business house at the proper time on the night of
the killing, and that he had a gun.   The witness Williams
testified that he saw appellant leave his store about nine
o'clock on the night of the killing ; that he was travelling
in a stooping position, and had something in his hand like
a stick.   This was all, in the shape of direct evidence, that
the State had to show that appellant was out of his busi-

ness house on the night of the killing, or that he had a gun with him; hence the truth or falsity of Williams's testimony on this point becomes of the utmost importance to both the State and appellant. And we think the improper admission of any evidence that the jury might think calculated to strengthen the testimony of said witness would be good ground for reversal.

We call attention to the error complained of in the sixth assignment. We are clearly of the opinion that the court should have charged the jury the law with reference to the evidence of an accomplice, in view of the testimony of the witness Barnes. While it may be true that this witness was connected with appellant just to the extent that he says he was, and no farther (if in fact appellant had any connection with the murder of Cline), and it may be true that he knows just what he testified that he knew, and nothing more, with reference to the appellant and the killing of Cline, still, if true, it is contrary to human experience, and it is a great tax upon any one's credulity to accept it as such. It is by no means probable that, on the night previous to the killing, the appellant should have had a conversation with this witness and requested him to go on this bloody mission, without first imparting some knowledge of the character of the transaction in which they were jointly to embark, and in some manner learning something of the willingness of the witness to join him; and another strange part of this story is that there should be such a full and perfect understanding between these parties as to the details of the trip, — such as to where witness should get a horse, at what hour of the night he should come to town, and at what place he should hitch his horse, — and still not a word be said as to the purpose and nature of the trip. And what is still more improbable, according to the story of this witness, is that, on the next night after this conversation, and on the night of the killing, he, having procured a horse, came to the town of Dexter at the appointed time,

fastened his horse at the place designated, and then for the first time had a conversation with appellant in regard to the character of the business they were about to enter upon, and then learned for the first time from appellant that the mission was unlawful and that appellant meant to kill some man. It is true that he says he declined to go when he heard the unlawful nature of appellant's design; but then, according to his testimony, he made no effort to restrain appellant, but, upon the contrary, promised appellant that he would not mention what he knew about it.

We think on his evidence alone the jury were warranted in believing that, if appellant was implicated in the murder of Cline, this witness was also engaged in it. But if we accept his testimony as true, and view it in the light of the other evidence, he is clearly an accomplice or accessory, if not a principal actor. We find from his own statement that he knew appellant was going to kill a man. The intimate and confidential relations which existed between himself and appellant in regard to this transaction called loudly upon him at least to make some effort to persuade appellant to desist. But he not only fails to interfere in any manner, but he actually agrees to keep it secret, thus concealing the crime from discovery and the perpetrator from prosecution. But for this agreement on the part of this witness, this brutal tragedy might never have been enacted, if indeed the appellant was an actor in it. We can perceive no distinction in the aid thus given by this witness to the alleged perpetrator of this crime, and the aid given when a party furnishes the weapon with which to commit the crime. If the weapon were withheld in the one instance, perhaps no crime would be committed; if the promise were withheld in the other, in all probability no crime would have stained the hands of appellant (if in fact he committed the deed). But, in addition to this, we find him next morning, after the news of the murder had spread over the country and startled the people into commotion,

and when Barnes, if what he testified to be true, was bound to know that appellant was at least connected with the crime, in the store with appellant; and, doubtless alarmed that appellant's strange demeanor would betray him and lead to his arrest, he advises him to go to bed, and thus conceal himself from public view. And we further see that when Whittington, the employer of appellant, returns home the day after the killing, and asks this witness what he knew with reference to it, he denies knowing any thing about it, and says if he did he would tell. All this conclusively shows that Barnes was such a participant in the crime as to subject his testimony to the rule that requires the evidence of participants to be corroborated. *Barrara* v. *The State*, 42 Texas, 260; *Williams and Smith* v. *The State*, 42 Texas, 322; *Carroll* v. *The State*, 3 Texas Ct. App. 117; *Davis* v. *The State*, 2 Texas Ct. App. 606.

We believe the evidence in this case demanded from the court an instruction to the jury as to what would be their duty in the event that they believed that appellant only participated in the murder of Cline as an accomplice. It appears from the evidence of Lewis Williams that on the day before Cline was killed at night, appellant wanted witness to go after E. S. Gardner and tell him to come to Dexter that evening; but before witness started, Gardner came in. And it appears from the evidence of Barnes, that when he had the conversation with appellant on the night Cline was killed, appellant told him that he was not going that night; as Whittington was away, he was afraid to leave the store alone. The proof fails to identify but one horse-track along the road from Dexter to Cline's, and that is claimed to be the track of Gardner's mare. It is not shown that appellant had a horse that night, and it fully appears from all the evidence that he did not go to Cline's afoot. There is no proof that appellant left the store that night, except by the witness Lewis Williams, who is flatly contradicted by two witnesses equally as credible as he.

Gardner returned alone to Whittington's store after eleven o'clock on the night Cline was killed; he was on horseback, and it is supposed he was riding the mare whose track it is claimed was identified along the road from Dexter to Cline's. It is not claimed that there was or could have been but one gun used or carried to Cline's that night. All this renders it highly probable that if appellant had any thing to do with the murder of Cline, he procured another to commit the act, while he was not present. If this position be borne out by the evidence, the court should have instructed the jury to acquit if they believed appellant only acted as an accomplice, as he could not be convicted as such under the indictment. 1 Bishop's Cr. Law, 542. Besides, the jury should have been instructed that before they could convict appella.t they must believe the evidence introduced to be sufficient to convict the principal. Rev. Penal Code, art. 85.

*Thomas Ball*, Assistant Attorney-General, for the State. 1. It is contended by appellant that the witness Barnes was and is an accomplice in the murder of Cline, and for that reason the court should have charged on the necessity of corroborating his statements. For the State it is submitted that on an examination of the evidence it will appear that Barnes was and is not an accomplice, in any legal view. See Whart. on Hom., sects. 345, 346; Penal Code, art. 86.

2. Defendant did not except to the charge of the court because on the weight of evidence, and therefore it will not be reviewed. *Robinson* v. *The State*, 24 Texas, 154; *Bishop* v. *The State*, 43 Texas, 290.

3. No exceptions were taken to the charge of the court, and no special charges were asked. *Williams* v. *The State*, 41 Texas, 209; Code Cr. Proc., art. 27; Code Cr. Proc., art. 685.

4. The counsel for the State did right, on cross-examination, to have the witness Porter relate the talk he and

Williams had the morning after the murder : *first*, for the purpose of showing that the witness Williams had told the same tale before as on the trial, about the occurrence of the night of the killing ; *second*, to get the whole of the conversation, the existence of which, and the matter to which it related, having been drawn out by defendant in his direct examination of his own witness.

5. It was admissible to prove the acts and doings of defendant as well after as before the killing occurred. *Handline* v. *The State*, 6 Texas Ct. App. 347.

WHITE, P. J.   On the night of the 7th of August, 1878, one Willis Cline was assassinated, between the hours of ten and eleven, at his home, four miles north of the village of Dexter in Cooke County.   At the time he was murdered, he and his wife, to whom he had been married but little over a month, were asleep upon the porch upon the north side of the house.   On the following morning appellant and one E. S. Gardner were arrested as the perpetrators of the deed, and each was separately indicted for the murder at the February term, 1879, of the District Court.   At the August term, 1879, this appellant was tried and found guilty, and his punishment affixed at death by hanging.

A noticeable feature is presented by the record in this case.   Between the date of the filing of the indictment and the time of trial, to wit, on the twenty-fourth day of July, 1879, our Revised Penal Code had become operative, and by its express provisions the punishment for murder in the first degree was changed from death absolutely, as provided in the old law (Pasc. Dig., art. 2271), to death or confinement in the penitentiary for life.   Rev. Stats., Penal Code, art 609.

By art. 15, chap. 1, of the Penal Code it is declared that " when the penalty for an offence is prescribed by one law and altered by a subsequent law, the penalty of such second law shall not be inflicted for a breach of the law committed

before the second shall have taken effect. In every such case the offender shall be tried under the law in force when the offence was committed, and, if convicted, punished under that law; except that when by the provisions of the second law the punishment of the offence is ameliorated, the defendant shall be punished under such last enactment, unless he elect to receive the penalty prescribed by the law in force when the offence was committed." In pursuance of this provision, defendant on his trial moved the court in writing to permit him to elect to receive the punishment fixed by the law in force at the time the crime was alleged to have been committed; that if convicted he did not desire to receive the punishment fixed by the law now in force. His motion was granted by the court, and the jury were appropriately charged with regard to the punishment under the old law.

The case is one of entirely circumstantial evidence. Two bills of exception are found incorporated in the record, which are mainly relied on as cause for reversal in the very able and ingenious oral argument and brief of counsel for appellant. With regard to the supposed error contained in the first portion of the first bill, — to wit, that the court permitted the prosecution to withdraw the announcement made the evening before, that the testimony was closed, without assigning a reason for asking such withdrawal, and allowed the introduction of other testimony over objection of defendant, — such practice is authorized by the Code, which provides that " the court shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appear that it is necessary to a due administration of justice." Rev. Stats., Code Cr. Proc., art. 661. And the discretion thus confided in the judge will not be subject for revision, " unless it be made to appear that the discretion has been abused to defeat the ends of justice." *Kemp* v. *The State*, 38 Texas, 110; *Roach* v. *The State*, 41 Texas, 262; *Sherwood* v. *The State*, 42 Texas, 498;

*Harris* v. *The State*, 44 Texas, 146; *Treadway* v. *The State*, 1 Texas Ct. App. 668; *Lister* v. *The State*, 3 Texas Ct. App. 17.

The latter portion of this first bill of exceptions is saved to the admission of a certain portion of the testimony of the witness Bourland, who stated: "I was in Whittington's store on the morning after Cline was killed, and before Noftsinger and Gardner were arrested. While I was there, a man came in and did some trading with Noftsinger. As soon as this man went out, Noftsinger asked Barnes, who was also in the store, who the man was that he had traded with. He said he had sold him some goods on the order of another person, and did not ask the man his name. Barnes told him he did not know who the man was; and also said to Noftsinger, 'What is the matter with you to-day? You must be crazy; you sold that woman, awhile ago, more calico than she paid you for. You had better go off and go to bed.' Noftsinger made no reply, but immediately turned and walked off."

It is not perceived why this evidence should be held inadmissible. The conversation was one between the defendant himself and Barnes; and Barnes's *impromptu* declarations to him, in consequence of the strangeness of his conduct, tend to establish the fact that immediately after the homicide was found to have been committed his conduct was not in keeping with what it was ordinarily. "In a case like the present, depending wholly upon circumstantial evidence, the mind seeks to explore every possible source from which any light, however feeble, may be derived." *Cooper* v. *The State*, 19 Texas, 443; *Barnes* v. *The State*, 41 Texas, 351; *Hamby* v. *The State*, 36 Texas, 523; *Black* v. *The State*, 1 Texas Ct. App. 368. And in such cases the nature of the case, in many instances, demands a greater latitude in the presentation of the evidences of the circumstances than where a conviction is sought upon direct and positive testimony. *Ballew* v. *The State*, 36 Texas, 98.

Criminative or inculpatory circumstantial evidence is derived from the *conduct* of the party accused, and external objects or physical facts with their appearances as indicative of such conduct. " Hence," as is well remarked by Mr. Burrill, " where a case of suspected crime has become the subject of judicial investigation, and the general fact of the commission of a crime has been ascertained, and particularly where vigorous measures have been set on foot to trace out the individual perpetrator, the idea, now converted into prospect, of discovery, and that becoming a more and more probable event as fact after fact is brought to light, naturally and almost necessarily fills the mind with alarm ; particularly where the criminal finds his own person drawn (or is likely to be drawn) within the sphere of investigation. Emotion and agitation exhibited under such circumstances, especially when no charge of guilt has yet been made or insinuated, are regarded, and justly, amongst the most convincing evidences of criminal agency that can be submitted to a human tribunal." Burrill on Cir. Ev. 466. The court did not err in admitting, or in refusing to strike out, this evidence. *Handline* v. *The State*, 6 Texas Ct. App. 348 ; Roscoe's Cr. Ev. 18, 19.

It is insisted, and this is the point reserved in the second bill of exceptions, that the court committed a grave error in permitting the witness George Porter to testify as to the import of a conversation between himself and the State's witness Lewis Williams on the morning after the killing. Lewis Williams, when on the stand, had testified that he had seen the defendant leave the storehouse the night of the killing, and pass through a lot not far from where he (the witness) was talking to one Julia Love ; that he told Julia Love it was Mr. Noftsinger, and he thought George Porter heard him tell her so. The defence introduced Porter to contradict this statement of the witness Williams ; which Porter did, he testifying, on his examination-in-chief, " I did not see Noftsinger, nor did I hear Williams tell me

nor any one else that night that he saw Noftsinger, but I heard him say something about it next morning." On cross-examination, the State's counsel asked the witness what the witness Lewis Williams said, the morning after Cline was killed, about seeing the defendant the night before; which question and answer were objected to, but the objection was overruled, and the witness permitted to testify that early the next morning, before Noftsinger and Gardner were arrested, the witness Williams told him he saw Noftsinger the night before get over the fence from Whittington's lot into Dunlap's yard.

The matter having been drawn out by the defence on the examination-in-chief, it was a legitimate subject for cross-examination by the prosecution. 1 Greenlf. on Ev., sects. 448, 449.

It is strenuously urged that the witness Barnes was a *particeps criminis*, coming within the rule of accomplices which requires that their testimony shall be corroborated. Pasc. Dig., art. 3118; Rev. Stats., Code Cr. Proc., art. 741. More properly speaking, if we understand the position of defendant's counsel, the witness is claimed to be an accessory, — that is, " one who, knowing that an offence has been committed, conceals the offender." Rev. Stats., Penal Code, art. 86. But in either view of the case, whether as an accomplice or accessory, we do not think the position is maintainable. Barnes neither advised nor encouraged the defendant in the commission of the act, before it was done (Rev. Stats., art. 79), but, on the contrary, states that defendant never told him where he was going. " He would not tell me," says the witness. " He said he was going to get away with a man; that a man had deprived him of his pleasure, and that he intended to deprive that man of his. I told him if that was what he wanted, I would not go with him. He then said, 'I am not going to-night.' * * * I told him if he intended to get away with a man the way I thought he

did from the way he talked, that I would have nothing to do with it. And I said to him, ' If you do that, they will catch you and break your d—d neck.'' Such language and conduct on the part of the witness was, in our opinion, any thing but encouraging, at least in the statutory sense. But it is said he promised defendant that he would say nothing about the matter, and that he did not tell what the defendant told him till some time after the killing. Mr. Wharton says : '' The concealment of the knowledge that a felony is to be committed will not make the party concealing it an accessory before the fact, nor will a tacit acquiescence, or words which amount to a bare permission, be sufficient to constitute this offence.'' And if the procurer of a felony repent, and, before the felony is committed, actually countermand his order, and the principal notwithstanding commit the felony, the original contriver will not be an accessory.'' Whart on Hom. (2d ed.), sects. 345, 346.

The objections urged to the charge of the court are untenable. It appears to be a carefully prepared and able exposition of the law as applicable to the case, and embraced all the different phases in which the facts should be legitimately considered, and instructed the jury most aptly in reference to the rules essential to be observed before they would be warranted in a conviction upon circumstantial evidence alone.

The zealous counsel, in their brief, say, ''We do not believe the evidence in the case legally sufficient to sustain the verdict ; '' but they have failed to point out its defects and insufficiency, either in the oral argument or brief. We have examined the statement of the testimony most carefully, in view of the fact that the life of the accused was being weighed alone in the scales of circumstantial evidence. We have been unable to discover any wanting links in the chain of inculpatory facts, which, commencing with his motives, his grudges, and his threats, go on down regularly, step by step, with sure and unerring certainty, each fact consistent

with the main fact, and all the facts consistent with each other; and all, as one concrete whole, leading the mind satisfactorily and inevitably to the conclusion of his guilt, beyond the entertainment of a reasonable doubt.

We have found no error in the record of his conviction, and the judgment is therefore affirmed.

*Affirmed.*