## BARNES V. THE STATE.

1. CIRCUMSTANTIAL EVIDENCE.—To justify a conviction on circumstantial evidence alone, the facts relied on must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of guilt.

2. EVIDENCE.—In a case where conviction is sought on circumstantial evidence alone, every circumstance which may tend, though slightly, to support the consistency and probability of a statement made by the accused, should be permitted to go to the jury.

APPEAL from Harrison. Tried below before the Hon. M. D. Ector.

Mrs. Barnes was charged with the murder of her husband, in the county of Harrison, on the 4th day of February, A. D. 1874.

On the morning of the day on which the murder was committed, Barnes was seen quite drunk in a grocery, in company with a negro about five feet seven inches high, who was sober. Barnes being unable to walk, was carried to his home by this negro, assisted by one of the witnesses. On reaching Barnes' home, he "fell in, or was put in," and was left by the witness lying on the floor, helplessly drunk, being unable to stand. After getting Barnes into his house, the negro said to the witness, "You can go now; I will take care of him," whereupon the witness departed, leaving Barnes, his wife, and the negro shut up in the room, and its only occupants. This occurred before noon on the day of the murder. Though more than one witness saw the negro with Barnes in the morning of the murder, none of those who saw him seem to have known him.

About noon, William Wilson, who occupied a sleeping room adjoining the house occupied by Barnes and his wife, had occasion to enter his sleeping room, when he heard what he termed "a rumpus" in the room occupied by Barnes. This witness heard Mrs. Barnes cry out "Murder!

Murder!" and at the same time another voice said, "Oh, hush!" After hearing this, the witness listened, and heard what he termed a heavy "thud" and muffled conversation in the Barnes house, but could not distinguish the words. Wilson after this left his room and went to his place of business, some sixty yards distant, where, seeing a policeman named Young, he informed him of the difficulty, and advised him to go to the house. Young went to within thirty yards of the house, and continued to watch it for some time, during which he observed Mrs. Barnes come out "more than three times" with a basket and pick up chips. No one else came out of the house during the period it was watched by Young, which was more than half an hour.

Frank Poe, a negro, testified that on the day of the murder he was passing the Barnes house. When at the distance of thirty yards from it, he heard sounds of strife proceeding from the house. The noise was loud and violent, but he could not distinguish the words. He advanced toward the door, and heard a woman's voice say, "Put down that axe," and afterwards a man's voice say, "Oh, oh," after which all was still and the witness left. Some time during the evening of the same day, a number of witnesses who had learned that Barnes had been murdered visited his house; but there is nothing in the record to disclose when, how, or by whom the murder was first discovered. On entering the house they found Barnes still lying on the floor at the place where he had been left by those who took him to his house. His head was nearly severed from the body, a pool of coagulated blood was seen on the floor, and an axe, on the blade of which was also found coagulated blood. In the floor, under Barnes' neck, was found a cut or mark, which seemed to have been made with an axe. Mrs. Barnes was sitting in a chair, in the same room, the fixtures and furniture of which were found in disorder. Her person bore marks of violence, her eyes

were much bruised, the sight of one, which was bloody, being much endangered. Her neck and side also bore marks of violence, which, in the opinion of one witness, could only have been inflicted by a strong man. The body of Barnes was cold. On the bed clothing was found the mark of a bloody hand, and the bloody mark of a man's thumb on the door.

William Wilson, who was among the witnesses who entered the room, exclaimed on seeing the dead man, "Great God, what is this?" to which Mrs. Barnes replied, "It was that negro." Being asked "what negro?" she said, "That man Henry Jones or Jones Henry that was here this morning." She stated that he had attempted to ravish her, and had then murdered her husband. At this point she was advised to see a lawyer, and to say nothing more about the matter until she could obtain his advice.

The defendant offered to prove on the trial, by one Friday Sharp, that he knew a black negro about five feet seven inches high named Henry Smith, who, on the evening of the day on which Barnes was killed, called upon the witness to borrow money, and stated that he was compelled to leave the country, and that he had not since been seen. The objection of the District Attorney to this evidence was sustained, and defendant excepted.

Mrs. Barnes was found guilty of manslaughter, and her punishment assessed at three years' imprisonment in the State penitentiary.

*W. S. Coleman,* for appellant.

*George Clark, Attorney General,* for the State.

MOORE, ASSOCIATE JUSTICE.—To justify a conviction upon circumstantial evidence alone, the facts relied upon must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of guilt.

Whatever suspicion may be aroused against appellant by some of the facts disclosed in the record, and although her conduct may not have been entirely consistent in all respects with what we may think it should have been, if the theory of her counsel furnishes the correct explanation of the transaction, still, when all the facts as now presented are calmly and dispassionately considered, we are clearly of the opinion they are insufficient to warrant, beyond all reasonable doubt, the belief that appellant is guilty of the offense of which she has been convicted. Indeed, whatever conclusion may be justified by a more full and satisfactory development of the facts and circumstances connected with and throwing light upon the transaction, which may probably result from another trial, the evidence as set forth in the record is less capable of explanation and more incompatible with the supposition of appellant's guilt than her innocence.

The deceased was carried home "before noon" of the day on which he was killed (a nearer approximation of the time is unfortunately not given) in a helpless state of intoxication. He was so drunk that he could not stand up; was put in or fell into his house; and was left by the witness who assisted in carrying him home lying flat on the floor, with both doors of the house closed. There were in the house with him when left by this witness appellant and a negro, who had been seen with him several times during the morning, and who had assisted in carrying him home.

Who this negro was, where he lived, when he left the house, what became of him, or what connection or acquaintance he had with appellant or her husband, is not shown.

Two witnesses testify to hearing in the house what one of them calls a "rumpus" and the other "sounds of strife," which he says were loud and violent, though at the distance he was from the house at first he could not distin-

guish any words; but when he went nearer he heard some
one in a woman's voice say, "Put down that axe," and
then in a man's voice the words, "Oh!" "Oh!"    The
other witness says he heard appellant cry out, "Mur-
der!" "Murder!" and at the same time a voice saying,
"Oh, hush!" and shortly afterwards a heavy thud; which,
from other evidence, we think, was most probably the
sound produced by the striking of the axe upon the floor
when the death blow was given.    This "rumpus" was
heard by the witness while in his sleeping-room, where he
went, he says, "about twelve o'clock noon."    The time when
the "sounds of strife" were heard by the other witness is
not stated.    It is therefore only a matter of inference that
the testimony of these witnesses has reference to the same
transaction.    Unless, however, the strife heard by the one
was before the other went to his sleeping-room, it would
seem most probable to be the same, as another witness,
we may infer from his testimony, would also have heard
it, if it had occurred subsequently.

Very soon after one o'clock p. m., says the only witness
who fixes the time, a number of citizens, who had heard
that Barnes had been killed, went to his house; but by
whom information of his death was given, or how and
where these persons first heard of it, is not stated, and
whether the doors were still closed when they reached the
house is not told.    The body of the deceased was found
lying upon the floor where he was left by the witness who
carried him home, the head almost entirely severed from
the body, the body cold, and the blood upon the floor co-
agulated; but no blood was found upon the hands of de-
ceased or anywhere about him, except about the wound
on the neck, and his clothing presented no appearance or
evidence of violence.    The room, however was found in a
badly disordered condition, the furniture and fixtures
scattered about and displaced.    There was the mark of a
bloody hand upon the covering of the bed.    Whether of

a man's or woman's hand is not stated. And the print of a bloody thumb upon the panel of the door, too large to have been made by a woman's thumb. Whether its position indicated that it was made when opening the door or otherwise is not shown. No one was found in the house but appellant, and she bore marks of recent struggle and of great personal violence. Her neck was badly bruised. Her eyes were bloody and badly hurt. One of them was nearly out. She had received other injuries of such violent character that, in the opinion of the physician who attended upon her, they could only have been inflicted "by the full strength of a strong man," and were, he said, dangerous to life, and such as might have produced insensibility.

In response to the inquiries of some of those who had gone to the house on hearing that Barnes had been killed, appellant said the negro, who had been there in the morning, "Henry Jones" or "John Henry," the witness did not remember which, had attempted to rape her and then murdered her husband; but further explanation by her seems to have been checked by the ill-judged, though no doubt kindly-meant suggestion of some of those present, "Not to say anything about the matter until she could get the advice of a lawyer." Whatever may have been the motive which prompted this advice, it was untimely and detrimental to the ends of justice, if she was guilty of the crime with which she is charged, and still more injurious and unfortunate for her if innocent. Her statements would have been of incalculable aid in ferreting out and developing the true facts of the case, and if shown to be clearly and indisputably false in any material particular, as no doubt might have been done if she is guilty, would have raised a strong presumption of her guilt. On the other hand, if she is innocent, and her statement was consistent with itself and the intrinsic probabilities from the surrounding circumstances, it would have been as a shield of brass

for her defense, unless its falsity in some particular could
be shown.

But, looking at the case as it is presented to us, upon
what theory can it be maintained that appellant is guilty
of the crime of which she is convicted? Was it by her
hand the terrible blow was struck which severed the head
of the deceased from his body? If so, when and how was
it given? The position of the body on the floor, where de-
ceased had been left too drunk to stand up, as well as the
rectangular character of the wound, indicates that this
blow by which it was inflicted must have been dealt while
he was lying upon the floor, and this negatives the idea
that he came to his death while an active participant in
the "rumpus" or "strife" heard by the witnesses. Con-
sequently, we should conclude appellant, if guilty at all, is
guilty of murder, instead of manslaughter. If the deceased
was killed when the blow was struck which caused the
heavy thud heard by the witness, as seems most probable,
it is, we think, unreasonable to suppose that appellant
slew him, or that she was giving aid and assistance to the
person who killed him. It was a woman's voice which
was heard saying, "Put down that axe!" It was appel-
lant who was heard crying out, "Murder!" "Murder!"
Surely it is not from one who is about to strike the fatal
blow, or who is aiding and assisting others who are, that
we should expect to hear this fearful and alarming cry.
Nor if it was her confederate who seized the axe, can we
suppose appellant would have called upon him to put it
down.

There was, unquestionably, a violent struggle in the
house about an hour prior to the time when these persons
who had heard of Barnes' death reached it. The disor-
dered condition of the furniture, the print of the bloody
hand upon the covering of the bed and of the bloody thumb
upon the door, the outcries of appellant heard by the wit-
nesses, and the injuries inflicted upon her, manifests the

violent character of this struggle, and plainly shows that
appellant was one of the victims of and sufferers from it.
Who was the other party to this strife and violence heard
by the witnesses, and shown by the marks of it left in the
room and on the person of appellant?  Certainly we do
not feel warranted, from the testimony before us, in saying
it was her husband.  If we were to infer that time enough
had elapsed, after he was carried home, to have become
sufficiently sober to have gotten up and to have had the
physical capacity to inflict the injuries shown to have been
done appellant, which her physician says required "the
full strength of a strong man," the fact that no blood was
found upon his hands nor anywhere about him, except
about the wound in his neck, and that his clothing pre-
sented no appearance of his having been engaged in a
struggle, repels the supposition that it was with him she
was engaged in this conflict.  Surely, if appellant had suf-
ficient strength to sever with an axe by a single blow the
head of deceased from his body, he could not have had
such a conflict with her as is shown by the disordered con-
dition of the room and the marks of its violence left on
her person, without either his person or clothing showing
some trace or evidence of it.

If the injuries done appellant were not inflicted by her
husband, we must infer that she received them from the
negro man who came home with him, and that it was
with him that she had this conflict.  He is the only per-
son shown to have been about the house after the witness
who assisted in carrying deceased home left.  He mani-
fested the intention at that time of remaining there, we
suppose, until Barnes should get sober.  But if we con-
clude the negro was still in the house, and the injuries re-
ceived by appellant were inflicted by him, if Barnes was
killed by her, unless it was subsequent to their conflict
and after he had left, we must infer that he was a party
to, if not the principal, in the crime.  But upon this hy-

pothesis there seems to us no mitigating circumstances which reduces the offense to manslaughter. And if we suppose that Barnes was killed by either of them, by the connivance and in concert with the other, there is then no reasonable motive by which we can account for the violent struggle and conflict between them. And if we suppose Barnes to have been killed by appellant prior to her conflict with the negro, or if not with him, or with whoever may have been her adversary, and that he was in no way implicated with her, he must unquestionably have been fully aware of Barnes's death, and we must suppose, if he failed to do so before, he would, at least, after their conflict, have denounced her for his murder, instead of aiding her to conceal her guilt by his silence or flight, giving her an opportunity, if she sought to avail herself of it, of shifting suspicion from herself on to him; and if she did not do this, furnishing the strongest evidence of his complicity with her.

There is still less reason, we think, to suppose that the deceased was killed by appellant after this conflict was over, in which she was so shockingly, and, as the physician says, dangerously injured. No noise indicating strife was subsequently heard in the house, although during most of the time a policeman was on the watch near by. The condition of the body indicated that the deceased had been killed for about the length of time which elapsed from the struggle and heavy thud heard by the witness until examined by the parties who went to the house on hearing that he had been killed.

The fact of appellant's remaining quietly at home without notifying any one of the first outrage attempted upon herself and brutal murder of her husband, though able, notwithstanding her injuries, to go out as often as three times and gather chips for her fire, while the party who she charges with these horrible offenses would have the opportunity by flight to escape the penalty of his terrible

crimes, if such is the case, is unquestionably a circum-
stance of grave suspicion, and militates strongly against
the theory of her defense.  But still it only shows that
conflicting conclusions may be deduced from the different
aspects in which the case may be viewed.  And that we
give not undue weight to her silence during the short time
which elapsed after her husband was killed until it was
generally known, we must remember the dissimilarity in
physical as well as mental and moral impulses of different
persons under like circumstances.  Due allowance should
also be made for the mental as well as bodily suffering
which she must have endured.  Though conscious of in-
nocence, she may have been for the time bowed down and
overwhelmed by the horror of her position, with no one, it
may be, to whom she could go for friendly aid or counsel.
It is also to be observed, if she failed to denounce the party
she now charges with the murder with the promptness we
suppose she might or should, still she betrayed no con-
sciousness of guilt by flight, and made no effort to conceal
the crime.  We may also add, that we cannot say from the
record that it was not through her that the fact of Barnes's
death was made known.

Although the fact which appellant proposed to prove by
the witness Sharp, unless more closely connected with the
case, or made to appear more pertinent in some way than
is shown by the bill of exception, it would seem to us to
be entitled to but little weight, still in some degree it tends
to support the consistency and probability of appellant's
statement, and it should, we think, have been permitted
to go to the jury.

As was said by the court in the case of Cooper v. The
State, 19 Tex., 458: " In cases like the present, depending
wholly upon circumstantial evidence, the mind seeks to
explore any possible source from which any light, however
feeble, may be derived; and in such a case it is peculiarly
proper that the jury should have before them every fact

and circumstance, however slight, which may aid them in coming to a satisfactory conclusion."

The judgment is reversed and the case remanded.

REVERSED AND REMANDED.