## SALLY HILL v. THE STATE.

1. MURDER — MALICE.— When the proof shows an unlawful killing, and no evidence has been adduced which tends to show express malice on the one hand, or any justification, excuse or mitigation on the other, the law implies malice, and the offense is murder of the second degree.

2. SAME.— CHARGE OF THE COURT directed the jury, in the event of finding from the evidence that the defendant was guilty of murder in the second degree, to assess his punishment at confinement in the penitentiary for any length of time "not less than five,"— the word "years" being omitted. *Held*, that the context supplies the

omitted word, "years," and that the omission could not have misled the jury.

3. MANSLAUGHTER.— ADEQUATE CAUSE is an essential element of the offense of manslaughter. In the absence of evidence tending to show the existence of adequate cause, the court did not err in refusing a charge upon manslaughter.

4. HOMICIDAL INTENT.— Article 612 of the Penal Code provides: "That the instrument or means by which a homicide is committed are to be taken into consideration in judging of the intent of the party offending; if the instrument be one not likely to produce death, it is not to be presumed that death was designed unless from the manner in which it was used such intention evidently appears."

5. SAME.— Article 613 of the Penal Code provides that "if any injury be afflicted in a cruel manner, though with an instrument not likely under ordinary circumstances to produce death, the killing will be manslaughter or murder according to the facts of the case." Articles 612 and 613 apply to cases where *intent* to kill evidently appears, or where such intent is evidenced by the cruelty of the manner in which the injury was inflicted.

6. SAME — CHARGE OF THE COURT.— Article 614 of the Penal Code embodies the law of a case in which there was no intention to kill, and when the homicidal act was divested of the elements of an evil and cruel disposition. Under it the person offending may be prosecuted and convicted of any grade of assault and battery. Note the state of proof held in this case to necessitate a charge to the jury embodying the law as enacted in said article 614.

APPEAL from the District Court of Marion. Tried below before the Hon. B. T. ESTES.

The indictment charged the appellant with the murder of "Mack," a colored child, by whipping, beating, choking and strangling. The offense is charged to have been committed in Marion county, Texas, on the 19th day of August, 1881. Her trial resulted in a conviction of murder in the second degree, and the punishment was fixed by the jury at a term of ten years in the penitentiary.

The opinion of this court gives a clear outline of this case and an explicit summary of the most material portions of the testimony. The evidence in detail, however, will be found to enhance the significance of the rulings.

The defendant and the deceased, as well as most of the witnesses, were negroes.

The first witness introduced by the prosecution was Emeline Cole, who seems to have been the only observer of the violence to which the prosecution imputed the death of the child. Her testimony in chief appears fully in the opinion of this court. On her cross-examination she stated that she had never seen the defendant whip the child before the occasion on Tuesday, August 17, 1881, the incidents of which the witness had narrated in her direct testimony. Witness lived close to the defendant, but they had not visited each other. After defendant had whipped the child, the witness walked in and sat down on the gallery in front of defendant's house. The child, by order of the defendant, then went off after aunt Sally Alexander, who lived about a quarter of a mile from defendant's. When the child returned, after nearly an hour's absence, he sat down on the gallery with witness. He did not complain of being hurt, and said little or nothing. Witness left before aunt Sally Alexander came to defendant's. The child appeared sickly and weakly all the time witness knew him, and on the 17th of August, 1881, his hands, feet and body were puffed up and swollen.

Maria Gillam, for the State, testified that she lived about forty yards from defendant's, and knew the child Mack in his lifetime. About sunset on the Tuesday before the Thursday on which Mack died, he asked witness for a drink of water, and when she gave it to him she noticed a bruise on his head. Cross-examined, the witness stated that Mack always seemed to be so sick that she pitied him. Witness heard no whipping, screaming or blows at defendant's on the day she noticed the bruise on Mack's head, nor had she ever heard any there either before or since that day.

Harriett Thompson, for the State, testified that Mack had been sickly and puny for a long time before he died.

On the Tuesday or Wednesday before his death, witness saw him driving some ducks or geese along the road towards the defendant's house, when the defendant came up behind him, and, after saying something to him, commenced whipping him. Witness could not tell the size of the switch or stick with which the whipping was done, but saw the licks. Mack came to witness's house that day; he was looking awful bad. On her cross-examination the witness stated that she lived in the third house from defendant's. She did not examine Mack's mouth and throat on the day spoken of; but one of her daughters did, and found them sore and swollen. Witness was not on visiting terms with the defendant. They had fallen out about witness getting water from defendant's well.

Sally Kelly, for the State, testified that she and several other colored women went to the defendant's on the Thursday morning, after they heard the child was dead. They stood at defendant's gate and one of them asked defendant where the dog was. Defendant replied that the dog was under the house, and then, speaking to witness and the rest, said: "I don't know what all you negro whores are coming up here for; you have not been coming here, and you are not welcome here now." Sallie Alexander was there washing the dead child, and defendant said she was hunting a sheet to lay the child out on. Witness said, "let's get away from here," and she and her companions left. She heard the defendant say that the little son of a bitch was dead and gone out of her way either to heaven or hell, and she did not care which,— that she could now occupy her room.

Cross-examined, the witness stated that she and her companions never had visited nor had any dealings with the defendant, who thought them not nice enough to associate with her. She called them strumpets, and told them they were not welcome at her house. Witness

stated that she was the girl who had had three fights with a certain doctor, and who reported him. She thought Mack was not a strong child, and that he was rather sickly looking; but stated that he was well about dusk the night before the day of his death, and was then at witness's house, and asked her for a nickel, saying that he had lost one given him by the defendant to buy some oil with, and wanted witness to give him another so that the defendant would not whip him. He was then well and bright, as usual; nothing was the matter with him that witness could see.

Sally Alexander, for the State, testified that she was a regular visitor of the defendant, and had seen defendant whip Mack, but not on the day Mack came after witness as stated by Emeline Cole. Witness, defendant and another woman were the only persons present when Mack died. On her cross-examination the witness stated that she had been seeing Mack at the defendant's several months, ever since the latter married her last husband. Mack was sickly all the time. A week or two before he died they gave him mullen tea, without benefit, and then they went to Mr. Robinson and got some medicine for him. Witness examined his mouth; his throat was eat away in places, and had large white blisters in it. Witness mopped it out several times. Defendant could not see well enough to dress and wash out his throat, and got witness to do it for several days before he died. Witness visited defendant every day or two, and never saw her mistreat Mack; she always acted towards him like a mother. He had had the bowel complaint ever since he had lived with defendant. When witness washed his throat, his jaws were swollen, and his throat was swollen on the outside. His feet also were swollen, and for weeks or months previously they swelled up at intervals. He digested nothing; his food passed right through him. Witness could not say what killed Mack, but thought his

death a natural result from his sickness. Witness washed and dressed him after his death, and saw some black spots·on his belly and chest. At first they were hardly visible, but got black very fast. Witness saw a few places on him as if he had been whipped. He died on Thursday, August 19, 1881, in the forenoon.

Dr. J. G. Eason, for the State, testified that he was a witness before the inquest held on the deceased, August 20, 1881. Witness made a partial examination of the corpse, and found it badly bruised on the chest and belly. The head was bruised, and there were pretty severe bruises all over the body. The throat was bruised internally, as shown by the color of the blood and flesh. Witness's opinion was that the boy's death was caused by these bruises. They could not have been made by his own weight or a fall. Some of them were a little older than others.

On his cross-examination the doctor stated that the boy's penis was covered with abrasions indicating inflammation. There were marks of violence on the boy, which the witness thought were signs of severe whipping. He seemed to be about seven years of age. The blood in his neck was of an unnatural color; choking might have been the cause. The witness was clearly of opinion that the boy's death was the result of violence. This completed the evidence for the State.

The first witness for the defense was Jesse Hill, the defendant's husband. They had been married eight or ten months when Mack died. He was a grandson of witness, and his father and mother were dead. After their death and that of witness's first wife, he got Mrs. Joe Jones to take care of Mack, and nurse and raise him; and when witness married the defendant, he took Mack home. When Mack died he was in his eighth year. He had had chronic diarrhœa, which became worse from time to time. In fact he had always been sickly. Witness never saw

the defendant mistreat Mack in any manner, and she always treated him kindly. Witness had told her to correct Mack as she would her own child. When Mack died the witness was absent from home, and received a telegram from the defendant informing him of that fact. Defendant had also written to witness, but he did not get the letter in time to reach home before the child died. Mack could not retain his food; it passed through him like water. Whenever he ate a hearty meal he at once became worse, and sometimes would be confined to his bed for several days. His three brothers and sisters were sickly, and they, together with their father and mother, all died in one house within the same year. The last time witness saw Mack, which was about two weeks before his death, there were blisters in his mouth and throat, and his feet, hands and throat were swollen. His feet had long been in the habit of swelling at intervals. Defendant tried to keep him clean and nice, and to do the part of a mother by him. On his cross-examination by the State, the witness said he knew nothing about the defendant having whipped Mack a day or two before he died.

Mrs. Joe Jones, for the defense, testified that she had known Mack all his life. She also knew his father, mother, brothers and sisters; they all died within a single year and in the same house, one right after another, leaving Mack. His grandfather, Jesse Hill, after the death of his wife brought Mack to live with witness, who kept him until Jesse married the defendant. Mack was always puny and sickly, had diarrhœa, an unnatural appetite, and an inability to retain his food. While he lived with witness his throat, belly, hands and feet would occasionally swell up; she thought he had the dropsy.

Rev. Richard Bentley, a colored theologian, testifying for the defense, acknowledged that he knew the defendant and Mack, the decedent. On the Tuesday next preceding

the Thursday on which Mack departed this life, the witness accompanied a friend to the railroad depot, and on their way they found Mack lying at a railroad trestle. He was crying, and said he had tried to jump from one railroad-tie to another, and had fallen. His mouth was bleeding, and witness's companion wiped it. He was lying on the track, and seemed very hot. They carried him into the shade of a neighboring tree, and got him a drink of water. He said he was hunting for the geese, and undertook to cross the trestle instead of going around it because he was in a hurry.

Dr. Terhune, an experienced physician, testifying for the defense, stated that ulcers in the throat were caused by a variety of diseases, such as scrofula, syphilis, chronic diarrhœa, and the like. When a child of eight years had such ulcers in the throat, accompanied with chronic diarrhœa for months, and occasional swelling of the feet, hands and throat, the time of its death was near at hand. Witness would expect such a patient to survive but a few days, and any excitement would accelerate death. He knew the trestle referred to by the witness Bentley. It was some ten or fifteen feet high, and, in witness's opinion, if a child of eight years, diseased as aforesaid, should receive such a fall from it as was in proof, death would be hastened and might be caused by the fall. Sometimes inflammation of the throat extends to the kidneys, and when it reaches the penis death is imminent. Chronic diarrhœa is very deceptive in its last stages; sometimes the patient will be up and about, making but little complaint, and often will be apparently well only a day or two before death, and then die suddenly. A sufferer from it sometimes has a morbid appetite and will gormandize, and too much food or water is very dangerous to such a patient, and may hasten death. Such a result might be hastened, if not occasioned, by a surfeit of sweet-meats. On his cross-examination the witness said

that a severe whipping or choking of a child thus affected would hasten its death.   On re-direct examination it was the witness's opinion that, if the child thus afflicted was severely whipped with a bundle of switches, then got a fall on a root, got up and walked away, next fell from a trestle and bruised his mouth and body, and about the same time overgorged himself with preserves, and death ensued, it would be almost impossible to specify the *causa mortis*.   The disease alone might cause it, and the other things simply accelerate the disease and hasten death.

Dr. Stoddard, who also was a physician of experience, was introduced and examined by the defense.   His testimony was of very similar import to that of Dr. Terhune, and therefore need not be given in detail.

*W. T. Armistead*, for the appellant.   Under the first assignment of errors the proper definition of implied malice was not given to the jury, in this: the law does not presume malice from the act of killing *per se*, but implied malice is malice presumed by the law from certain deliberate and cruel acts, all of which must be found to exist by the jury, whose province it is to determine the grade of the offense.   Does the law presume that there was a voluntary homicide, and that the killing was with deliberation, design, or cruelty?   Implied malice can only be inferred by the jury from the facts and circumstances attending the homicide.   *Jordan* v. *State*, 10 Texas, 479; *Tooney* v. *State*, 5 Texas Ct. App. 163; *Evans* v. *State*, 6 Texas Ct. App. 513; *Murray* v. *State*, 1 Texas Ct. App. 417; *Sharp* v. *State*, 6 Texas Ct. App. 650; *Harris* v. *State*, 8 Texas Ct. App. 90; *Hubby* v. *State*, 8 Texas Ct. App. 598; *Webb* v. *State*, 8 Texas Ct. App. 115; *Babb* v. *State*, 8 Texas Ct. App. 173.

II.   The second assignment specifies the failure of the court to charge the number of years to be assessed as pun-

ishment. The word *years* does not appear after *five* in the charge of the court. The charge must be correct as to the penalty, else the conviction cannot stand. *Buford* v. *State,* 44 Texas, 525; *Searcy* v. *State,* 1 Texas Ct. App. 440; *Allen* v. *State,* 1 Texas Ct. App. 514; *Garnett* v. *State,* 1 Texas Ct. App. 605; *Jones* v. *State,* 7 Texas Ct. App. 338; *Collins* v. *State,* 5 Texas Ct. App. 38.

If the charge errs as to the limitation in a felony case, it is fatal even though it be favorable to the accused. *Shoefercater* v. *State,* 5 Texas Ct. App. 207; *Davis* v. *State,* 6 Texas Ct. App. 133. "Five," not followed by any period of time, is too indefinite, and in fact fixes no time at all.

III. The court failed to charge on manslaughter. The instrument used by the appellant in whipping the child Mack was switches of ordinary size, and the jury should have been permitted to pass on the question whether the killing was murder or manslaughter. See art. 613, Penal Code. If death had not ensued from the alleged injury inflicted by the appellant on deceased, at most she could only have been convicted of an aggravated assault. *Yanez* v. *State,* 20 Texas, 656.

She was authorized to chastise her grand-stepson,— he having been placed under her charge by her husband, in whose care and custody the child was being raised,— and his parents being dead. What whipping was done was not laid on in a cruel manner, but was done under the influence either of sudden passion or with the desire to correct the child for disobedience and gluttony in the eating of the preserves. Hence the appellant might have been convicted of any grade of assault and battery. Art. 614, Penal Code.

If the circumstances even show a cruel or evil disposition, or that the appellant had the design to kill, she would be guilty of murder or manslaughter according to the means or instruments used, under the facts in

proof.    Art. 615, Penal Code.    If the appellant had tortured and ill-treated the child, that of itself would not establish express malice.    *Shelton* v. *State*, 34 Texas, 662. And in such a case the appellant should be permitted to prove any other hypothesis which would tend to her exculpation.    *Bouldin* v. *State*, 8 Texas Ct. App. 332.

"If, in answer to a criminal charge, whether supported by direct or circumstantial evidence, the accused can affirmatively show but a single circumstance leading to the necessary inference that the crime charged could not possibly have been committed by him, it will be sufficient to overthrow the whole accusation, however clearly it may have been established."    Burrill on Circumstantial Ev. p. 511.    "And circumstantial evidence is always insufficient if, assuming all the facts proved which the evidence tends to prove, some other hypothesis may still be true," etc. 1 Stark. Ev. p. 573.

We submit that the accused by proof showed five hypotheses wholly inconsistent with her guilt.

(1) She proved her uniform kindness towards and motherly care for the deceased child.

(2) She proved that the deceased has been suffering from chronic diarrhœa and was in the last stage of the disease, approaching dissolution, when she whipped him with the switches.

(3) She proved that a child of the deceased's age — seven years — afflicted with chronic diarrhœa would have its death hastened, if not occasioned, by gormandizing preserves, as was undisputed in this case.

(4) She proved that a fall on a trestle, as described, would also hasten if not produce death.

(5) And that the deceased's death may have been produced from a natural cause — the disease with which he was afflicted;— and that his death may have been occasioned from either one of the causes enumerated.

In view of all the record in this case we suggest that

an old grey-haired woman, who had raised two families of children and has married her third husband, in her declining age, and against whom only colored nymphs of the pave with whom she would not hold any communication could speak a word inculpating her, was not guilty of an intentional wrong, and is entitled to a reversal of the judgment against her.

*H. Chilton*, Assistant Attorney General, for the State.

WHITE, P. J. As viewed in the light of the evidence before us the facts connected with the homicide charged are substantially these, viz.: Mack, the deceased, a boy of some seven years of age, was the step-grandson of appellant. His parents were dead, and for some time prior to his death he had been residing with his grandparents. He was extremely delicate, having suffered from chronic diarrhœa, ulcerated sore throat, and swollen limbs. Experts who testified to a diagnosis of the case at the trial thought his ailments might have been caused by scrofula or hereditary syphilis, and, taking the symptoms as testified by the other witnesses as criteria for their opinion, concluded that his condition was critical, and death from these diseases imminent and likely to ensue at any time. The boy, however, was able to walk about and go errands.

Emeline Cole, the principal witness for the prosecution, testified: "On Tuesday, the 17th of August, 1881, before the child died the next Thursday, I was passing her (Sally Hill's) house about 11 o'clock, A. M., and called to her to come with me to see a house close by, which I wanted to rent from Mr. Taylor. As aunt Sally came out of the yard she told Mack not to meddle with or take any of the preserves she had been making. When we came back a short time thereafter, the child had his pockets filled with the preserves, and his hands and mouth and cloth-

ing were besmeared with them.  Aunt Sally then asked him why he had acted so, and he denied it.  She then got some switches from a peach tree in the yard and whipped the child with them, but I cannot say how long she whipped him.  She then caught the child by the throat and neck with both hands and choked him, raised him up and threw him down, and when she let him loose he fell, striking his head against a root.  She shook him as she held him, with both hands.  I had told her some days before she whipped the child that he was sick, and she ought to give him some mullen tea.  I was about six feet from the root the child's head struck.  He is dead. He made two attempts to get up before he succeeded. Defendant stated at the time she hoped the child would die, and hoped that it would be dead next morning.  Witness saw the child after it was dead and before; it was mightily bruised; could not lay your finger down for stripes.   This happened the day before the child died."

Another witness for the State testified that on Wednesday evening, the day of the whipping and choking, Mack was at her house at dusk.

For the defense, amongst other matters, it was proven by one Bently that on the Tuesday before the child died he and another party found Mack at the trestle on the railroad.  He says, "we found Mack lying there crying. We talked to him and he said he had fallen on the trestles, that he had tried to jump from one tie to the other, and had fallen.  His mouth was bleeding and brother Mitchell wiped it off.  Mack lay in the track when we came up.  He seemed very hot, and we wiped him and carried him into the shade of a tree near by, and got him some water to drink from a house close by."

Dr. Eason, who was present when the coroner's inquest was held upon the dead body, testified: " I made a partial examination of the body.  I found it badly bruised on the chest and belly, and bruises on the head and pretty

*severely* all over his body.　I found his throat internally bruised, as shown by the color of the blood and flesh, and it is my opinion that the death of the boy was caused by the effect of these bruises.　The bruises could not have been made by his own weight or a fall.　Some of the bruises were a little older than the others.　I found the penis of the boy covered with abrasions, showing signs of inflammation.　I found marks of violence on the body of the boy.　He seemed to be about seven years old. From the marks on the body I took it they were signs of his having been severely whipped.　The blood in his neck did not have its natural color.　Choking might have caused it.　From all of the signs of violence on the dead body, I am clearly of the opinion that they produced the death of the boy."

The theory of the defense was that death and the bruised appearance of the body were superinduced by disease, or the complication of diseases, from which he was suffering, and his fall upon the railroad trestles.　There was also evidence adduced showing uniform kindness on the part of appellant towards the deceased whilst he lived with her.

The motion for a new trial was mainly based upon supposed errors of omission and commission in the charge of the court.　Of commission, the errors complained of were as to implied malice and circumstantial evidence. Neither of these grounds are well taken.　When the fact of unlawful killing is proved, and no evidence tends to show express malice on the one hand or any justification, excuse or mitigation on the other, the law implies malice and the offense is murder in the second degree.　This doctrine is now well settled in this State.　*Harris* v. *State*, 8 Texas Ct. App. 91.　Upon circumstantial evidence the charge is fully supported by the approved authorities.　*Barnes* v. *State*, 41 Texas, 342; *Black* v. *State*, 1 Texas Ct. App. 391; *Hunt* v. *State*, 7 Texas Ct. App. 213.

Of omission, the errors indicated are the failure to give the period of punishment of murder of the second degree, failure to charge manslaughter, and the failure to charge certain statutory provisions applicable to the state of facts made by the evidence. As to the punishment of murder in the second degree, the charge reads: "If you find the defendant guilty of murder of the second degree, you will so say by your verdict and assess her punishment at imprisonment in the penitentiary for any period of time in your discretion not less than five." The word "*years*," which should have followed the last word "five," is omitted. This omission, however, could not possibly have confused or misled the jury. The word *years* would naturally and irresistibly supply itself from the context.

Nor did the court err in declining to charge the law of manslaughter. "Manslaughter is voluntary homicide committed under the immediate influence of sudden passion arising from *an adequate cause*, but neither justified or excused by law." Penal Code, art. 593. There can be no manslaughter unless predicable upon "*adequate cause*," which is the essential element in determining that crime. *McKinney* v. *State*, 8 Texas Ct. App. 627. In the case before us we look in vain for the slightest tittle of evidence going to establish any semblance of adequate cause.

In our opinion the main question and the most serious one suggested by the statement of facts was whether or not the appellant *intended to kill deceased*, judging her act by the means used and the manner of doing it. Certain statutory rules have been prescribed as aids to the solution of such questions. It is provided that "the instrument or means by which a homicide is committed are to be taken into consideration in judging of the intent of the party offending; if the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless from the manner in which it was used such intention evidently appears." Penal Code, art. 612.

"Art. 613. If any injury be inflicted in a cruel manner, though with an instrument not likely under ordinary circumstances to produce death, the killing will be manslaughter or murder according to facts of the case."

"Art. 614. Where a homicide occurs under the influence of sudden passion, but by the use of means not in their nature calculated to produce death, the person killing is not deemed guilty of the homicide unless it appears that there was an intention to kill, but the party from whose act the death resulted may be prosecuted for and convicted of any grade of assault and battery." See also *Dones* v. *State*, 8 Texas Ct. App. 112.

Now, whilst the otherwise admirable charge of the court submitted the issues arising under the provisions of articles 612, 613 and 615, which apply to cases where *the intention* evidently appears, ŏr where it is evidenced by the cruelty of the manner in which the injury was inflicted, it did not submit the alternative proposition presented in article 614, *supra*, as to the law where there was no intention to kill and the homicide was divested of the elements of an evil and cruel disposition. From a careful investigation of all the facts as they are stated in the record, we are of opinion that defendant was entitled to have this view of the law submitted to the jury in a plain, pointed and affirmative manner. If she was not actuated by an intention to kill, or by an evil or cruel disposition, then the killing could not be murder, and her offense might have been reduced to any grade of assault and battery.

For this error of omission in the charge, the judgment will be reversed and the cause remanded for a new trial.

*Reversed and remanded.*